JERRY E. SMITH, Circuit Judge:
The United States[1] appeals a preliminary injunction, pending trial, forbidding implementation of the Deferred Action for Parents of Americans -and Lawful Permanent Residents program (“DAPA”). Twenty-six states (the “states”[2]) challenged DAPA under the Administrative Procedure Act (“APA”) and the Take Care Clause of the Constitution;[3] in an impressive and thorough Memorandum Opinion and Order issued February 16, 2015, the district court enjoined the program on the ground that the states are likely to succeed on their claim that DAPA is subject to the APA’s procedural requirements. Texas v. United States, 86 F.Supp.3d 591, 677 (S.D.Tex.2015).[4]
The government appealed and moved to stay the injunction pending resolution of the merits. After extensive briefing and more than two hours of oral argument, a motions panel denied the stay after determining that the appeal was unlikely to succeed on its merits. Texas v. United States, 787 F.3d 733, 743 (5th Cir.2015). Reviewing the district court’s order for abuse of discretion, we affirm the preliminary injunction because the states have standing; they have established a substantial likelihood of success on the merits of their procedural and substantive APA claims; and they have satisfied the other elements required for an injunction.[5]
I.
A.
In June 2012, the Department of Homeland Security (“DHS”) implemented the -Deferred Action for Childhood Arrivals program (“DACA”).[6] In the DACA Memo *147 to agency heads, the DHS Secretary “set[ ] forth how, in the exercise of ... prosecuto-rial discretion, [DHS] should enforce the Nation’s immigration laws against certain young people” and listed five “criteria [that] should be satisfied before an individual is considered for an exercise of prose-cutorial discretion.”[7] The Secretary further instructed that “[n]o individual should receive deferred action ... unless they [sic] first pass a background check and requests for relief ... are to be decided on a case by case basis.”[8] Although stating that “[f]or individuals who are granted deferred action ..., [U.S. Citizenship and Immigration Services (‘USCIS’) ] shall accept applications to determine whether these individuals qualify for work authorization,” the DACA Memo purported to “confer[] no substantive right, immigration status or pathway to citizenship.”[9] At least 1.2 million persons qualify for DACA, and approximately 636,000 applications were approved through 2014. Dist. Ct. Op., 86 F.Supp.3d at 609.
In November 2014, by what is termed the “DAPA Memo,” DHS expanded DACA by making millions more persons eligible for the program[10] and extending “[t]he period for which DACA and the accompanying employment authorization is granted ... to three-year increments, rather than the current two-year increments.”[11] The Secretary also “directed] USCIS to establish a process, similar to DACA,” known as DAPA, which applies to “individuals who ... have, [as of November 20, 2014], a son or daughter who is a U.S. citizen or lawful permanent resident” and meet five additional criteria.[12] The Secretary stated that, although *148 “[deferred action does not confer any form of legal status in this country, much less citizenship[,] it [does] mean[ ] that, for a specified period of time, an individual is permitted to be lawfully present in the United States.”[13] Of the approximately 11.3 million illegal aliens[14] in the United States, 4.3 million would be eligible for lawful presence pursuant to DAPA. Dist. Ct. Op., 86 F.Supp.3d at 612 n. 11, 670.
“Lawful presence” is not an enforceable right to remain in the United States and can be revoked at any time, but that classification nevertheless has significant legal consequences. Unlawfully present aliens are generally not eligible to receive federal public benefits, see 8 U.S.C. § 1611, or state and local public benefits unless the state, otherwise provides, see 8 U.S.C. § 1621.[15] But as the government admits in its opening brief, persons granted lawful presence pursuant to DAPA are no longer “bar[red] ... from receiving social security retirement benefits, social security disability benefits, or health insurance under Part A of the Medicare program.”[16] That follows from § 1611(b)(2) — (3), which provides that the exclusion of benefits in § 1611(a) “shall not apply to any benefits] payable under title[s] II [and XVIII] of the Social Security Act ... to an alien who is lawfully present in the United States as determined by the Attorney General....” (emphasis added). A lawfully present alien is still required to satisfy independent qualification criteria before receiving those benefits, but the grant of lawful presence removes the categorical b.ar and *149 thereby makes otherwise ineligible persons eligible to qualify.
“Each person who applies for deferred action pursuant to the [DAPA] criteria ... shall also be eligible to apply for work authorization for the [renewable three-year] period of deferred action.” DAPA Memo at 4. The United States concedes that “[a]n alien with work authorization may obtain a Social Security Number,” “accrue quarters of covered employment,” and “correct wage records to add prior covered employment within approximately three years of the year in which the wages were earned or in limited circumstances thereafter.”[17] The district court determined — and the government does not dispute — “that DAPA recipients would be eligible for earned income tax credits once they received a Social Security number.”[18]
As for state benefits, although “[a] State may provide that an alien who is not lawfully present in the United States is eligible for any State or local public benefit for which such alien would otherwise be ineligible under subsection (a),” § 1621(d), Texas has chosen not to issue driver’s licenses to unlawfully present aliens.[19] Texas maintains that documentation confirming lawful presence pursuant to DAPA would allow otherwise ineligible aliens to become eligible for state-subsidized driver’s licenses. Likewise, certain unemployment compensation “[b]enefits are not payable based on services performed by an alien unless the alien ... .was lawfully present for purposes of performing the services....”[20] Texas contends that DAPA recipients would also become eligible for unemployment insurance.
B.
The states sued to prevent DAPA’s'im-plementation on three grounds. First, they asserted that DAPA violated the procedural requirements of the APA as a substantive rule that did not undergo the requisite notice-and-comment rulemaking. See 5 U.S.C. § 553. Second, the states claimed that DHS lacked the authority to implement the program even if it followed the correct rulemaking process, such that DAPA was substantively unlawful under the APA. See 5 U.S.C. § 706(2)(A)-(C). Third, the states urged that DAPA was an abrogation of the President’s constitutional duty to “take Care that the Laws be faithfully executed.” U.S. Const, art. II, § 3.
The district court held that Texas has standing. It concluded that the state would suffer a financial injury by having to issue driver’s licenses to DAPA beneficiaries at a loss. Dist. Ct. Op., 86 F.Supp.3d at 616-23. Alternatively, the court relied on a new theory it called “abdication standing”; Texas had standing because the United States has exclusive authority over immigration but has refused to act in that *150 area. Id. at 636-43. The court also considered but ultimately did not accept the notions that Texas could sue as parens patriae on behalf of citizens facing economic competition from DAPA beneficiaries and that the state had standing based on the losses it suffers generally from illegal immigration. Id. at 625-36.
The court temporarily enjoined DAPA’s implementation after determining that Texas had shown a substantial likelihood of success on its claim that the program must undergo notice and comment. Id. at 677. Despite full briefing, the court did not rule on the “Plaintiffs’ likelihood of success on their substantive APA claim or their constitutional claims under the Take Care Clause/separation of powers doctrine.” Id. On appeal, the United States maintains that the states do not have standing or a right to judicial review and, alternatively, that DAPA is exempt from the notice-and-comment requirements. The government also contends that the injunction, including its nationwide scope, is improper as a matter of law.
II.
“We review a preliminary injunction for abuse of discretion.”[21] A preliminary injunction should issue only if the states, as movants, establish
(1) a substantial likelihood of success on the merits, (2) a substantial threat of irreparable injury if the injunction is not issued, (3) that the threatened injury if the injunction is denied outweighs any harm that will result if the injunction is granted, and (4) that the grant of an injunction will not disserve the public interest.[22]
“As to each element of the district court’s preliminary-injunction analysis ... findings of fact are subject to a clearly-erroneous standard of review, while conclusions of law are subject to broad review and will be reversed if incorrect.”[23]
III.
The government claims the states lack standing to challenge DAPA. As we will analyze, however, their standing is plain, based on the driver’s-license rationale,[24] so we need not address the other possible grounds for standing.
As the parties invoking federal jurisdiction, the states have the burden of establishing standing. See Clapper v. Amnesty Int’l USA, — U.S. -, 133 S.Ct. 1138, 1148, 185 L.Ed.2d 264 (2013). They must show an injury that is “concrete, particularized, and actual or imminent; fairly traceable to the challenged action; and redressable by a favorable ruling.” Id. at 1147 (citation omitted). “When a litigant is vested with a procedural right, that litigant has standing if there is some possibility that the requested relief will *151 prompt the injury-causing party to reconsider the decision that allegedly harmed the litigant.” Massachusetts v. EPA, 549 U.S. 497, 518, 127 S.Ct. 1438, 167 L.Ed.2d 248 (2007). “[T]he presence of one party with standing is sufficient to satisfy Article Ill’s case-or-controversy requirement.” Rumsfeld v. Forum for Acad. & Institutional Rights, Inc., 547 U.S. 47, 52 n. 2, 126 S.Ct. 1297, 164 L.Ed.2d 156 (2006).
A.
We begin by considering whether the states are entitled to “special solicitude” in our standing inquiry under Massachusetts v. EPA They are.
The Court held that Massachusetts had standing to contest the EPA’s decision not to regulate greenhouse-gas emissions from new motor vehicles, which allegedly contributed to a rise in sea levels and a loss of the state’s coastal land. Massachusetts v. EPA, 549 U.S. at 526, 127 S.Ct. 1438. “It is of considerable relevance that the party seeking review here is a sovereign State and not ... a private individual” because “States are not normal litigants for the purposes of invoking federal jurisdiction.” Id. at 518,127 S.Ct. 1438.[25]
The Court identified two additional considerations that entitled Massachusetts “to special solicitude in [the Court’s] standing analysis.” Id., at 520, 127 S.Ct. 1438.[26] First, the Clean Air Act created a procedural right to challenge the EPA’s decision:
The parties’ dispute turns on the proper construction of a congressional statute, a question eminently suitable to resolution in federal court. Congress has moreover authorized this type of challenge to EPA action. That authorization is of critical importance to the standing inquiry: “Congress has the power to define injuries and articulate chains.of causation that will give rise to a case or controversy where none existed before.” “In exercising this power, however, Congress must at the very least identify the injury it seeks to vindicate and relate the injury to the class of persons entitled to bring suit.” We will not, therefore, “entertain citizen suits to vindicate the public’s nonconcrete interest in the proper administration of the laws.”[27]
Second, the EPA’s decision affected Massachusetts’s “quasi-sovereign” interest in its territory:
When a State enters the Union, it surrenders certain sovereign prerogatives. Massachusetts cannot invade Rhode Island to force reductions in greenhouse gas emissions, it cannot ne *152 gotiate an emissions treaty with China or India, and in some circumstances the exercise of its police powers to reduce in-state motor-vehicle emissions might well be pre-empted.
These sovereign prerogatives are now lodged in the Federal Government, and Congress has ordered EPA to protect Massachusetts (among others) by prescribing standards applicable to the “emission of any air pollutant from any class or classes of new motor vehicle engines, which in [the Administrator’s] judgment cause, or contribute to, air pollution which may reasonably be anticipated to endanger public health or welfare.”[28]
Like Massachusetts, the instant plaintiffs — the states — “are not normal litigants for the purposes of invoking federal jurisdiction,” id. at 518, 127 S.Ct. 1438 and the same two additional factors are present. First, “[t]he parties’ dispute turns on the proper construction of a congressional statute,”[29] the APA, which authorizes challenges to “final agency action for which there is no other adequate remedy in a court.” 5 U.S.C. § 704. Similarly, the disagreement in Massachusetts v. EPA concerned the interpretation of the Clean Air Act, which provides for judicial review of “final action taken[ ] by the Administrator.” 42 U.S.C. § 7607(b)(1). Further, as we will explain, the states are within the zone of interests of the Immigration and Nationality Act (“INA”);[30] they are not asking us to “entertain citizen suits to vindicate the public’s nonconcrete interest in the proper administration of the laws.”[31]
In enacting the APA, Congress intended for those “suffering legal wrong because of agency action” to have judicial recourse,[32] and the states fall well within that definition.[33] The Clean Air Act’s review provision is more specific than the APA’s, but the latter is easily adequate to justify “special solicitude” here. The procedural right to challenge EPA decisions created by the Clean Air Act provided important support to Massachusetts because the challenge Massachusetts sought to bring — a challenge to an agency’s decision not to act — is traditionally the type for which it is most difficult to establish standing and a justiciable issue.[34] Texas, by contrast, challenges DHS’s affirmative decision to set guidelines for granting lawful presence to a broad class of illegal aliens. Because the states here challenge DHS’s decision to act, rather than its decision to remain inactive, a procedural right similar to that created by the Clean Air Act is not necessary to support standing. See 5 U.S.C. § 704.
As we will show, DAPA would have a major effect on the states’ fiscs, causing *153 millions of dollars of losses in Texas alone, and at least, in Texas, the causal chain is especially direct: DAPA would enable beneficiaries to apply for driver’s licenses, and many would do so, resulting in Texas’s injury.
Second, DAPA affects the states’ “quasi-sovereign” interests by imposing substantial pressure on them to change their laws, which provide for issuing driver’s licenses to some aliens and subsidizing those licenses.[35] “[Sjtates have a sovereign interest in ‘the power to create and enforce a legal code.’ ”[36] Pursuant to that interest, states may have standing based on (1) federal assertions of authority to regulate matters they believe they control,[37] (2) federal preemption of state law,[38] and (3) federal interference with the enforcement of state law,[39] at least where “the state statute at issue regulatefs] behavior or provide[s] for the administration of a state program”[40] and does not “simply purports ] to immunize [state] citizens from federal law.”[41] Those intrusions.are analogous to pressure to change state law.[42]
Moreover, these plaintiff states’ interests are like Massachusetts’s in ways that implicate the same sovereignty concerns. When the states joined the union, they surrendered some of their sovereign prerogatives over immigration.[43] They cannot establish their own classifications of aliens,[44] just as “Massachusetts cannot invade Rhode Island to force reductions in greenhouse gas emissions [and] cannot negotiate an emissions treaty with China or India.”[45] The states may not be able to discriminate against subsets of aliens in their driver’s license programs without running afoul of preemption or the Equal Protection Clause;[46] similarly, “in some circumstances!, Massachusetts’s] exercise of its police powers to reduce in-state motor-vehicle emissions might well be pre *154 empted.”[47] Both these plaintiff states and Massachusetts now rely on the federal government to protect their interests.[48] These parallels confirm that DAPA affects the states’ “quasi-sovereign” interests.
The significant opinion in Arizona State Legislature v. Arizona Independent Redistricting Commission, — U.S. -, 135 S.Ct. 2652, 192 L.Ed.2d 704 (2015), announced shortly before oral argument herein, reinforces that conclusion. The Court held that the Arizona Legislature had standing to sue in response to a ballot initiative that removed its redistricting authority and vested it instead in an independent commission. Id. at 2665-66. The Court emphasized that the legislature was “an institutional plaintiff asserting an institutional injury” to what it believed was its constitutional power to regulate elections. Id. at 2664. So too are the states asserting institutional injury to their lawmaking authority. The Court also cited Massachusetts v. EPA as opining that the state in that case was “entitled to special solicitude in our standing analysis.” Id. at 2664-65 n. 10 (quoting Massachusetts v. EPA, 549 U.S. at 520, 127 S.Ct. 1438).
The United States suggests that three presumptions against standing apply here. The first is a presumption that a plaintiff lacks standing to challenge decisions to confer benefits on, or not to prosecute, a third party. But the cases the government cites for that proposition either did not involve standing;[49] concerned only nonprosecution (as distinguished from both nonprosecution and the conferral of benefits);[50] or merely reaffirmed that a plaintiff must satisfy the standing requirements.[51]
The second presumption is against justi-ciability m the immigration context. None of the cases the government cites involved standing[52] and include only general language about the government’s authority over immigration; without a specific discussion of standing, they are of limited relevance.[53]
The third presumption is that “[t]he [Supreme] Court’s standing analysis ... has been ‘especially rigorous when reaching the merits of the dispute would force [the Court] to decide whether an action taken by one of the other two branches of the Federal Government was unconstitutional.’ ”[54] We decide this appeal, however, without resolving the constitutional claim.
Therefore, the states are entitled to “special solicitude” in the standing inquiry. We stress that our decision is limited to these facts. In particular, the direct, substantial pressure directed at the states and *155 the fact that they have surrendered some of their control over immigration to the federal government mean this case is sufficiently similar to Massachusetts v. EPA, but pressure to change state law may not be enough — by itself — in other situations.
B.
At least one state — Texas—has satisfied the first standing requirement by demonstrating that it would incur significant costs in issuing driver’s licenses to DAPA beneficiaries. Under current state law, licenses issued to beneficiaries would necessarily, be at a financial loss. The Department of Public Safety “shall issue” a license to a qualified applicant. Tex. Transp. Code § 521.181. A noncitizen “must present ... documentation issued by the appropriate United States agency that authorizes the applicant to be'in the United States.” Id. § 521.142(a).
If permitted to go into effect, DAPA would enable at least 500,000 illegal aliens in Texas[55] to satisfy that requirement with proof of lawful presence[56] or employment authorization.[57] Texas subsidizes its licenses and would lose a minimum of $130.89 on each one it issued to a DAPA beneficiary.[58] Even a modest estimate would put the loss at “several million dollars.” Dist. Ct. Op., 86 F.Supp.3d at 617.
Instead of disputing those figures, the United States claims that the costs would be offset by other benefits to the state. It theorizes that, because DAPA beneficiaries would be eligible for licenses, they would register their vehicles, generating income for the state, and buy auto insurance, reducing the expenses associated with uninsured motorists. The government suggests employment authorization would lead to increased tax revenue and decreased reliance on social services.
Even if the government is correct, that does not negate Texas’s injury, because we consider only those offsetting benefits that are of the same type and arise from the same transaction as the costs.[59] “Once injury is shown, no attempt *156 is made to ask whether the injury is outweighed by benefits the plaintiff has enjoyed from'the relationship with the defendant. Standing is recognized to complain that some particular aspect of the relationship is unlawful and has caused injury.”[60] “Our standing analysis is not an accounting exercise....”[61]
The one case in which we concluded that the costs of a challenged program were offset by the benefits involved a much tighter nexus. In Henderson, 287 F.3d at 379-81, we determined that taxpayers lacked standing to challenge a Louisiana law authorizing a license plate bearing a pro-life message, reasoning that the plaintiffs had not shown that the program would use their tax dollars, because the extra fees paid by drivers who purchased the plates could have covered the associated expenses. The costs and benefits arose out of the same transaction, so the plaintiffs had not demonstrated injury.
Here, none of the benefits the government identifies is sufficiently connected to the costs to qualify as an offset. The only benefits that are conceivably relevant are the increase in vehicle registration and the decrease in uninsured motorists, but even those are based on the independent decisions of DAPA beneficiaries and are not a direct result of the issuance of licenses. Analogously, the Third Circuit held that sports leagues had standing to challenge New Jersey’s decision to license sports gambling, explaining that damage to the leagues’ reputations was a cognizable, injury despite evidence that more people would have watched sports had betting been allowed. NCAA, 730 F.3d at 222-24. The diminished public perception of the leagues and the greater interest in sports were attributable to the licensing plan but did not arise out of the same transaction and so could not be compared.
In the instant case, the states have alleged an injury, and the government predicts that the later decisions of DAPA beneficiaries would produce offsetting benefits. Weighing those costs and benefits is precisely the type of “accounting exercise,” id. at 223, in which we cannot engage. Texas has shown injury.
C.
Texas has satisfied the second standing requirement by establishing that its injury is “fairly traceable” to DAPA. It is undisputed that DAPA would enable beneficiaries to apply for driver’s licenses, and there is little doubt that many would do so because driving is a practical necessity in most of the state.
The United States urges that Texas’s injury is not cognizable, because the state could avoid injury by not issuing licenses to illegal aliens or by not subsidizing its licenses., Although Texas could avoid financial loss by requiring applicants to pay the full costs of licenses, it could not avoid injury altogether. “[S]tates have a sovereign interest in ‘the power to create and enforce a legal code,’ ”[62] and the possibility that a plaintiff could avoid injury *157 by incurring other costs does not negate standing.[63]
Indeed, treating the availability of changing state law as a bar to standing would deprive states of judicial recourse for many bona fide harms. For instance, under that theory, federal preemption of state law could never be an injury, because a state could always change its law to avoid preemption. But courts have often held that states have standing based on preemption.[64] And states could offset almost any financial loss by raising taxes or fees. The existence of that alternative does not mean they lack standing.
Relying primarily on Pennsylvania v. New Jersey, 426 U.S. 660, 96 S.Ct. 2333, 49 L.Ed.2d 124 (1976) (per curiam), the United States maintains that Texas’s injury is self-inflicted because the state voluntarily chose to base its driver’s license policies on federal immigration law. In Pennsylvania v. New Jersey, id. at 664, 666, 96 S.Ct. 2333 the Court held that several states lacked standing to contest other states’ laws taxing a portion of nonresidents’ incomes. The plaintiff states alleged that the defendant states’ taxes injured them because the plaintiffs gave their residents credits for taxes paid to other states, so the defendants’ taxes increased the amount of those credits, causing the plaintiffs to lose revenue. Id. at 663, 96 S.Ct. 2333. The Court flatly rejected that theory of standing:
In neither of the suits at bar has the defendant State inflicted any injury upon the plaintiff States through the imposition of the [challenged taxes]. The injuries to the plaintiffs’ fiscs were self-inflicted, resulting from decisions by their respective state legislatures. Nothing required Maine, Massachusetts, and Vermont to extend a tax credit to their residents for income taxes paid to New Hampshire, and nothing prevents Pennsylvania from withdrawing that credit for taxes paid to New Jersey. No State can be heard to complain about damage inflicted by its own hand.
Id. at 664, 96 S.Ct. 2333.
The more recent decision in Wyoming v. Oklahoma, 502 U.S. 437, 112 S.Ct. 789, 117 L.Ed.2d 1 (1992), also informs our analysis. There, the Court held that Wyoming had standing to challenge an Oklahoma law requiring some Oklahoma power plants to burn at least 10% Oklahoma-mined coal. Id. at 447, 112 S.Ct. 789. The Court explained that Wyoming taxed the extraction of coal in the state and that Oklahoma’s law reduced demand for that coal and Wyoming’s -corresponding revenue. Id. The Court emphasized that the case involved an “undisputed” “direct injury in the form of a loss of specific tax revenues.” Id. at 448, 112 S.Ct. 789. It rejected Oklahoma’s contention “that Wyoming is not itself engaged in the commerce affected, is not affected as a consumer, and thus has not suffered the type of direct injury cognizable in a Commerce Clause action,” id., *158 concluding that Wyoming’s loss of revenue was sufficient, id. at 448-50, 112 S.Ct. 789. The Court did not cite Pennsylvania v. New Jersey or discuss the theory that Wyoming’s injury was self-inflicted.
Both the Pennsylvania v. New Jersey plaintiffs and Wyoming structured then-laws in ways that meant their finances would have been affected'by changes in other states’ laws. Because the tax credits in Pennsylvania v. New Jersey were based on taxes paid to other states, any tax increases in other states would have decreased the plaintiffs’ revenues, and any tax cuts would have had the opposite effect. Analogously, Wyoming’s tax was based on the amount of coal extracted there, so any policies in other states that decreased demand for that coal would- have diminished Wyoming’s revenues, and any policies that bolstered demand would have had the opposite effect.
In other words, the schemes in both cases made the plaintiff states’ finances dependent on those of third parties — either resident taxpayers or coal companies — which in turn were affected by other states’ laws. The issues in Pennsylvania v. New Jersey and Wyoming v. Oklahoma were thus similar to the question here, but the Court announced different results. The two cases are readily distinguishable, however, and, based on two considerations, Wyoming v. Oklahoma directs our decision.
First, Texas and Wyoming sued in response to major changes in the defendant states’ policies. Texas sued after the United States had announced DAPA, which could make at least 500,000 illegal aliens eligible for driver’s licenses and cause millions of dollars of losses; Wyoming sued after Oklahoma had enacted a law that cost Wyoming over $1 million in tax revenues. See id. at 445-46 & n. 6, 112 S.Ct. 789. Conversely, the Pennsylvania v. New Jersey plaintiffs sued not because of a change in the defendant states’ laws but because they believed that Austin v. New Hampshire, 420 U.S. 656, 95 S.Ct. 1191, 48 L.Ed.2d 530 (1975), had rendered the defendants’ laws unconstitutional. See Pennsylvania v. New Jersey, 426 U.S. at 661— 63, 96 S.Ct. 2333. The fact that Texas sued in response to a significant change-in the defendants’ policies shows that its injury is not self-inflicted.
Second, the plaintiffs’ options for accomplishing their policy goals were more limited in this case and in Wyoming v. Oklahoma than in Pennsylvania v. New Jersey. Texas seeks to issue licenses only to those lawfully present in the United States, and the state is required to use federal immigration classifications to do so. See Villas at Parkside Partners, 726 F.3d at 536. Likewise, Wyoming sought to tax the extraction of coal and had no way to avoid being affected by other states’ laws that reduced demand for that coal.[65]
*159 By way of contrast, the plaintiff states in Pennsylvania v. New Jersey could have achieved their policy goal in myriad ways, such as basing their tax credits on residents’ out-of-state incomes instead of on taxes actually paid to other states. That alternative would have achieved those plaintiffs’ goal of allowing their residents to avoid double taxation of their out-of-state incomes, but it would not have tied the plaintiffs’ finances to other states’ laws. The fact that Texas had no similar option means its injury is not self-inflicted.
The decision in Amnesty International supports this conclusion: The Court held that the plaintiffs lacked standing to challenge a provision of the Foreign Intelligence Surveillance Act authorizing the interception of certain electronic communications. Amnesty Int’l, 133 S.Ct. at 1155. The plaintiffs alleged that they had been forced to take costly steps to avoid surveillance, such as traveling to meet in person and not discussing certain topics by email or phone. Id. at 1150-51. The Court held that any such injuries were self-inflicted, id. at 1152-53, reasoning that plaintiffs “cannot manufacture standing merely by inflicting harm on themselves based on their fears of hypothetical future harm that is not certainly impending.” Id. at 1151 (citing Pennsylvania v. New Jersey, 426 U.S. at 664, 96 S.Ct. 2333). “If the law were otherwise, an enterprising plaintiff would be able to secure a lower standard for Article III standing simply by making an expenditure based on a nonparanoid fear.” Id.
By way of contrast, there is no allegation that Texas passed its driver’s license law to manufacture standing. The legislature enacted the law one year before DACA and three years before DAPA was announced,[66] and there is no hint that the state anticipated a change in immigration policy — much less a change as sweeping and dramatic as DAPA. Despite the dissent’s bold suggestion that Texas’s license-plate-cost injury “is entirely manufactured by Plaintiffs for this case,” Dissent at 195, the injury is not self-inflicted.
In addition to its notion that Texas could avoid injury, the government theorizes that Texas’s injury is not fairly traceable to DAPA because it is merely an incidental and attenuated consequence of the program. But Massachusetts v. EPA establishes that the causal connection is adequate. Texas is entitled to the same “special solicitude” as was Massachusetts, and the causal link is even' closer here.
For Texas to incur injury, DAPA beneficiaries would have to apply for driver’s licenses as a consequence of DHS’s action, and it is apparent that many would do so. For Massachusetts’s injury to have occurred, individuals would have had to drive *160 less fuel-efficient cars as a result of the EPA’s decision, and that would have had to contribute meaningfully to a rise in sea levels, causing the erosion of the state’s shoreline. See Massachusetts v. EPA, 549 U.S. at 523, 127 S.Ct. 1438. There was some uncertainty about whether the EPA’s inaction was a substantial cause of the state’s harm, considering the many other emissions sources involved.[67] But the Court held that Massachusetts had satisfied the causation requirement because the possibility that the effect of the EPA’s decision was minor did not negate standing, and the evidence showed that the effect was significant in any event. Id. at 524-25, 127 S.Ct. 1438.
This case raises even less doubt about causation, so the result is the same. The matters in which the Supreme Court held that an injury was not fairly traceable to the challenged law reinforce this conclusion. In some of them, the independent act of a third party was a necessary condition of the harm’s occurrence, and it was uncertain whether the third party would take the required step.[68] Not so here.
DAPA beneficiaries have strong incentives to obtain driver’s licenses, and it is hardly speculative that many would do so if they became eligible. In other cases, in which there was insufficient proof of causation, several factors potentially contributed to the injury, and the challenged policy likely played a minor role.[69]
Far from playing an insignificant role, DAPA would be the primary cause and likely the only one. Without the program, there would be little risk of a dramatic increase in the costs of the driver’s-license program. This case is far removed from those in which the Supreme Court has held an injury to be too incidental or attenuated. Texas’s injury is fairly traceable to DAPA.
*161 D.
Texas has satisfied the third standing requirement, redressability. Enjoining DAPA based on the procedural APA claim could prompt DHS to reconsider the program, which is all a plaintiff must show when asserting a procedural right. See id. at 518, 127 S.Ct. 1488. And enjoining DAPA based on the substantive APA claim would prevent Texas’s injury altogether.
E.
The United States submits that Texas’s theory of standing is flawed because it has no principled limit. In the government’s view, if Texas can challenge DAPA, it could also sue to block a grant of asylum to a single alien or any federal policy that adversely affects the state, such as an IRS revenue ruling that decreases a corporation’s federal taxable income and corresponding state franchise-tax liability.
The flaw in the government’s reasoning is that Massachusetts v. EPA entailed similar risks, but the Court still held that Massachusetts had standing. Under that decision, Massachusetts conceivably could challenge the government’s decision to buy a car with poor fuel efficiency because the vehicle could contribute to global warming. The state might be able to contest any federal action that prompts more travel. Or it potentially could challenge any change in federal policy that indirectly results in greenhouse-gas emissions, such as a trade-promotion program that leads to more shipping. One of the dissenting Justices in Massachusetts v. EPA criticized the decision on that ground,[70] but the majority found those concerns unpersuasive, just as they are here.
After Massachusetts v. EPA, the answer to those criticisms is that there are other ways to cabin policy disagreements masquerading as legal claims.[71] First, a state that has standing still must have a cause of action. Even the APA — potentially the most versatile tool available to an enterprising state — imposes a number of limitations. A state must, be defending concerns that are “arguably within the zone of interests to be protected or regulated by the statute or constitutional guarantee in question.” [72] It is unclear whether a state dissatisfied with an IRS revenue ruling would be defending such an interest. Moreover, judicial review is unavailable where the statute precludes it or the matter is committed to agency discretion. 5 U.S.C. § 701(a). Because of those restrictions, a state would have limited ability to challenge many asylum determinations. See 8 U.S.C. § 1252(b)(4)(D). Further, numerous policies that adversely affect states either are not rules at all or are exempt from the notice-and-comment requirements. See generally 5 U.S.C. § 553.
Second, the standing requirements would preclude much of the litigation the government describes. For example, it would be difficult to establish standing to challenge a grant of asylum to a single alien based on the driver’s-license theory. The state must allege an injury that has *162 already occurred or is “certainly impending”;[73] it is easier to demonstrate that some DAPA beneficiaries would apply for licenses than it is to establish that a particular alien would. And causation could be a substantial obstacle. Although the district court’s calculation of Texas’s loss from DAPA was based largely on the need to hire employees, purchase equipment, and obtain office space,[74] those steps would be unnecessary to license one additional person.
Third, our determination that Texas has standing is based in part on the “special solicitude” we afford it under Massachusetts v. EPA as reinforced by Arizona State Legislature. To be entitled to that presumption, a state likely must be exercising a procedural right created by Congress and protecting a “quasi-sovereign” interest. See Massachusetts v. EPA 549 U.S. at 520, 127 S.Ct. 1438. Those factors will seldom exist. For instance, a grant of asylum to a single alien would impose little pressure to change state law. Without “special solicitude,” it would be difficult for a state to establish standing, a heavy burden in many of the government’s hypothet-icals.
Fourth, as a practical matter, it is pure speculation that a state would sue about matters such as an IRS revenue ruling. Though not dispositive of the issue, the absence of any indication that such lawsuits will occur suggests the government’s parade of horribles is unfounded,[75] and its concerns about the possible future effects of Texas’s theory of standing do not alter our conclusion. The states have standing.
IV.
Because the states are suing under the APA, they “must satisfy not only Article Ill’s standing requirements, but an additional test: The interest [they] assert[ ] must be ‘arguably within the zone of interests to be protected or regulated by the statute’ that [they] say[] was violated.” [76] That “test ... ‘is not meant to be especially demanding’ ” and is applied “in keeping with Congress’s ‘evident intent’ when enacting the APA ‘to make agency action presumptively reviewable.’ ”[77]
The Supreme Court “ha[s] always conspicuously included the word ‘arguably’ in the test to indicate that the benefit of any doubt goes to the plaintiff,” and “[w]e do not require any ‘indication of congressional purpose to benefit the would-be plaintiff.’ ”[78] “The test forecloses suit only when a plaintiff’s ‘interests are so marginally related to or inconsistent with the purposes implicit in the statute that it cannot reasonably be assumed that Congress intended to permit the suit.’ ”[79]
*163 The interests the states seek to protect fall within the zone of interests of the INA.[80] “The pervasiveness of federal regulation does not diminish the importance of immigration policy to the States,” which “bear[ ] many of the consequences of unlawful immigration.” Arizona v. United States, 132 S.Ct. at 2500. Reflecting a concern that “aliens have been applying for and receiving public benefits from Federal, State, and local governments at increasing rates,” 8 U.S.C. § 1601, “Congress deemed some unlawfully present aliens ineligible for certain state and local public benefits unless the state explicitly provides otherwise.”[81] With limited exceptions, unlawfully present aliens are “not eligible for any State or local public benefit.” 8 U.S.C. § 1621(a).
Contrary to the government’s assertion, Texas satisfies the zone-of-interests test not on account of a generalized grievance but instead as a result of the same injury that gives it Article III standing — Congress has explicitly allowed states to deny public benefits to illegal aliens. Relying on that guarantee, Texas seeks to participate in notice and comment before the Secretary changes the immigration classification of millions of illegal aliens in a way that forces the state to the Hobson’s choice of spending millions of dollars to subsidize driver’s licenses or changing its statutes.
V.
The government maintains that judicial review is precluded even if the states are proper plaintiffs. “Any person ‘adversely affected or aggrieved’ by agency action .. is entitled to ‘judicial review thereof,’ as long as the action is a ‘final agency action for which there is no other adequate remedy in a court.’ ”[82] “But before any review at all may be had, a party must first clear the hurdle of 5 U.S.C. § 701(a). That section provides that the chapter on judicial review ‘applies, according to the provisions thereof, except to the extent that— (1) statutes preclude judicial review; or (2) agency action is committed to agency discretion by law.’ ” Chaney, 470 U.S. at 828, 105 S.Ct. 1649.
“[T]here is a ‘well-settled presumption favoring interpretations of statutes that allow judicial review of administrative action,’ and we will accordingly find an intent to preclude such review only .if presented with ‘clear and convincing evidence.’ ”[83] The “ ‘strong presumption’ favoring judicial review of administrative action ... is rebuttable: It fails when a statute’s language or structure demonstrates that Congress wanted an agency to police its own conduct.” Mach Mining, LLC v. EEOC, — U.S. -, 135 S.Ct. 1645, 1651, 191 L.Ed.2d 607 (2015).
*164 Establishing unreviewability is a “heavy burden,”[84] and “where substantial doubt about the congressional intent exists, the general presumption favoring judicial review of administrative action is controlling.” Block v. Cmty. Nutrition Inst., 467 U.S. 340, 351, 104 S.Ct. 2450, 81 L.Ed.2d 270 (1984). “Whether and to what extent a particular statute precludes judicial review is determined not only from its express language, but also from the structure of the statutory scheme, its objectives, its legislative history, and the nature of the administrative action involved.” Id. at 345, 104 S.Ct. 2450.
The United States relies on 8 U.S.C. § 1252(g)[85] for the proposition that the INA expressly prohibits judicial review. But the government’s broad reading is contrary to Reno v. American-Arab Anti-Discrimination Committee (“AAADC”), 525 U.S. 471, 482, 119 S.Ct. 936, 142 L.Ed.2d 940 (1999), in which the Court rejected “the unexamined assumption that § 1252(g) covers the universe of deportation claims — that it is a sort' of ‘zipper’ clause that says ‘no judicial review in deportation cases unless this section provides judicial review.’ ”[86] The Court emphasized that § 1252(g) is not “a general jurisdictional limitation,” but rather “applies only to three discrete actions that the Attorney General may take: her ‘decision or action’ to ‘commence proceedings, adjudicate cases, or execute removal orders.’ ”[87]
None of those actions is at issue here— the states’ claims do not arise from the Secretary’s “decision or action ... to commence proceedings, adjudicate cases, or execute removal orders against any alien,” § 1252(g); instead, they stem from his decision to grant lawful presence to millions of illegal aliens on a class-wide basis. Further, the states are not bringing a “cause or claim by or on behalf of any alien” — they assert their own right to the APA’s procedural protections. Id. Congress has expressly limited or precluded judicial review of many immigration decisions,[88] including some that are made in the Secretary’s “sole and unreviewable discretion,” [89] but DAPA is not one of them.
Judicial review of DAPA is consistent with the protections Congress affords to states that decline to provide public benefits to illegal aliens. “The Government of the United States has broad, undoubted *165 power over the subject of immigration and the status of aliens,”[90] but, through § 1621, Congress has sought to protect states from “bear[ing] many of the consequences of unlawful immigration.”[91] Texas avails itself of some of those protections through Section 521.142(a) of the Texas Transportation Code, which allows the state to avoid the costs of issuing driver’s licenses to illegal aliens.
If 500,000 unlawfully present aliens residing in Texas were reclassified as lawfully present pursuant to DAPA, they would become eligible for driver’s licenses at a subsidized fee. Congress did not intend to make immune from judicial review an agency action that reclassifies millions of illegal aliens in a way that imposes substantial costs on states that have relied on the protections conferred by § 1621.
The states contend that DAPA is being implemented without discretion to deny applications that meet the objective criteria set forth in the DAPA Memo, and under AAADC, judicial review could be available if there is an indication that deferred-action decisions are not made on a case-by-case basis. In AAADC, a group of aliens “ehallenge[d] ... the Attorney General’s decision to ‘commence [deportation] proceedings’ against them,” and the Court held that § 1252(g) squarely deprived it of jurisdiction. AAADC, 525 U.S. at 487, 119 S.Ct. 936. The Court noted that § 1252(g) codified the Secretary’s discretion to decline “the initiation or prosecution of various stages in the deportation process,” id. at 483, 119 S.Ct. 936 and the Court observed that “[p]rior to 1997, deferred-action decisions were governed by internal [INS] guidelines which considered [a variety of factors],” id. at 484 n. 8, 119 S.Ct. 936. Although those guidelines “were apparently rescinded,” the Court observed that “there [was] no indication that the INS has ceased making this sort of determination on a case-by-case basis.” Id. But the government has not rebutted the strong presumption of reviewability with clear and convincing evidence that, inter alia, it is making case-by-case decisions here.[92]
A.
Title 5 § 701(a)(2) “precluded] judicial review of certain categories of administrative decisions that courts traditionally have regarded as ‘committed to agency discretion.’ ” Lincoln v. Vigil, 508 U.S. 182, 191, 113 S.Ct. 2024, 124 L.Ed.2d 101 (1993) (citation omitted). For example, “an agency’s decision not to institute enforcement proceedings [is] presumptively unreviewable under § 701(a)(2).” Id. (citation omitted). Likewise, “[t]here is no judicial review of agency action ‘where statutes [granting agency discretion] are drawn in such broad terms that in a given case there is no law to apply,’ ”[93] such as “[t]he allocation of funds from a lump-sum appropriation.” Vigil, 508 U.S. at 192, 113 S.Ct. 2024.
1.
The Secretary has broad discretion to “decide whether it makes sense *166 to pursue removal at all”[94] and urges that deferred action — a grant of “lawful presence” and subsequent eligibility for otherwise unavailable benefits — is a presumptively unreviewable exercise of pros-ecutorial discretion.[95] “The general exception to reviewability provided by § 701(a)(2) for action ‘committed to agency discretion’ remains a narrow one, but within that exception are included agency refusals to institute investigative or enforcement proceedings, unless Congress has indicated otherwise.”[96] Where, however, “an agency does act to enforce, that action itself provides a focus for judicial review, inasmuch as the agency must have exercised its power in some manner. The action at least can be reviewed to determine whether the agency exceeded its statutory powers.”[97]
Part of DAPA involves the Secretary’s decision — at least temporarily — not to enforce the immigration laws as to a class of what he deems to be low-priority illegal aliens. But importantly, the states have not challenged the priority 'levels he has established,[98] and neither the preliminary injunction nor compliance with the APA requires the Secretary to remove any alien or to alter his enforcement priorities.
Deferred action, however, is much more than nonenforcement: It would affirmatively confer “lawful presence” and associated benefits on a class of unlawfully present aliens. Though revocable, that change in designation would trigger (as we have already .explained) eligibility for federal benefits — for example, under title II and XVIII of the Social Security Act[99] — and state benefits — for example, driver’s licenses and unemployment insurance[100]— that would not otherwise be available to illegal aliens.[101]
*167 The United States maintains that DAPA is presumptively unreviewable prosecutorial discretion because “ ‘lawful presence’ is not a status and is not something that the alien can legally enforce; the agency can alter or revoke it at any time.”[102] The government further contends that “[e]very decision under [DAPA] to defer enforcement action against an alien necessarily entails allowing the individual to be lawfully present.... Deferred action under DAPA and ‘lawful presence’ during that limited period are thus two sides of the same coin.”[103]
Revocability, however, is not the touchstone for whether agency is action is reviewable. Likewise, to be reviewable agency action, DAPA need not directly confer public benefits — removing a categorical bar on receipt of those benefits and thereby making a class of persons newly eligible for them “provides a focus for judicial review.” Chaney, 470 U.S. at 882, 105 S.Ct. 1649.
Moreover, if deferred action meant only nonprosecution, it would not necessarily result in lawful presence. “[A]lthough prosecutorial discretion is broad, it is not ‘unfettered.’ ”[104] Declining to prosecute does not transform presence deemed unlawful by Congress into lawful presence and confer eligibility for otherwise unavailable benefits based on that change. Regardless of whether the Secretary has the authority to offer lawful presence and employment authorization in exchange for participation in DAPA, his doing so is not shielded from judicial review as an act of prosecutorial discretion.
This evident conclusion is reinforced by the Supreme Court’s description, in AAADC, of deferred action as a nonprose-cution decision:
To ameliorate a harsh and unjust outcome, the INS may decline to institute 'proceedings, terminate proceedings, or decline to execute a final order of deportation. This commendable exercise in administrative discretion, developed without express statutory authorization, originally was known as nonpriority and is now designated as deferred action .... Approval of deferred action status means that ... no action will thereafter he taken to proceed against an apparently deportable alien, even on grounds normally regarded as aggravated.[105]
*168 In their procedural claim, the states do not challenge the Secretary’s decision to “decline to institute proceedings, terminate proceedings, or decline to execute a final order of deportation,” nor does deferred action mean merely that “no action will thereafter be taken to proceed against an apparently deportable alien.”[106]
Under DAPA, “[d]eferred action ... means that, for a specified period of time, an individual is permitted to be lawfully present in the United States,”[107] a change in designation that confers eligibility for substantial federal and state benefits on a class of otherwise ineligible aliens. Thus, DAPA “provides a focus for judicial review, inasmuch as the agency must have exercised its power in some manner. The action at least can be reviewed to determine whether the agency exceeded its statutory powers.”[108]
2.
“The mere fact that a statute grants broad discretion to an agency does not render the agency’s decisions completely unreviewable under the ‘committed to agency discretion by law’ exception unless the statutory scheme, taken together with other relevant materials, provides absolutely no guidance as to how that discretion is to be exercised.”[109] In Perales, 903 F.2d at 1051, we held that the INS’s decision not to grant pre-hearing voluntary departures and work authorizations to a group of aliens was committed to agency discretion because “[t]here are no statutory standards for the court to apply.... There is nothing in the [INA] expressly providing for the grant of employment authorization or pre-hearing voluntary departure to [the plaintiff class of aliens].” Although we stated that “the agency’s decision to grant voluntary departure and work authorization has been committed to agency discretion by law,” id. at 1045, that case involved a challenge to the denial of voluntary departure and work authorization.
Under those facts, Perales faithfully applied Chaney’s presumption against judicial review of agency inaction “because there are no meaningful standards against which to judge the agency’s exercise of discretion.” Id. at 1047. But where there is affirmative agency action — as with DAPA’s issuance of lawful presence and employment authorization — and in light of the INA’s intricate regulatory scheme for changing immigration classifications and issuing employment authorization,[110] “[t]he action at least can be reviewed to determine whether the agency exceeded its statutory powers.” Chaney, 470 U.S. at 832, 105 S.Ct. 1649.
The United States asserts that 8 C.F.R. § 274a.l2(c)(14),[111] rather than DAPA, *169 makes aliens granted deferred action eligible for work authorizations. But if DAPA’s deferred-action program must be subjected to notice-and-comment, then work authorizations may not be validly issued pursuant to that subsection until that process has been completed and aliens have been “granted deferred action.” § 274a.l2(c)(14).
Moreover, the government’s limitless reading of that subsection — allowing for the issuance of employment authorizations to any class of illegal aliens whom DHS declines to remove — is beyond the scope of what the INA can reasonably be interpreted to authorize, as we will explain.[112] And even assuming, arguendo, that the government does have that power, Texas is also injured by the grant of lawful presence itself, which makes DAPA recipients newly eligible for state-subsidized driver’s licenses.[113] As an affirmative agency action with meaningful standards against which to judge it, DAPA is not an unreviewable “agency action ... committed to agency discretion by law.” § 701(a)(2).
B.
The government urges that this case is not justiciable even though “ ‘a federal court’s ‘obligation’ ’ to hear and decide cases within its jurisdiction is ‘virtually unflagging.’ ”[114] We decline to depart from that well-established principle.[115] And in invoking our jurisdiction, the states do not demand that the federal government “control immigration and ... pay for the consequences of federal immigration policy” or “prevent illegal immigration.”[116]
Neither the preliminary injunction nor compliance with the APA requires the Secretary to enforce the immigration laws or change his priorities for removal, which have expressly not been challenged.[117] Nor have the states “merely invited us to substitute our judgment for that of Congress in deciding which aliens shall be eligible to participate in [a benefits program].” Diaz, 426 U.S. at 84, 96 S.Ct. 1883.[118] DAPA was enjoined because the *170 states seek an opportunity to be heard through notice and comment, not to have the judiciary formulate or rewrite immigration policy. “Consultation between federal and state officials is an important feature of the immigration system,”[119] and the notice-and-comment process, which “is designed to ensure that affected parties have an opportunity to participate in and influence agency decision making,”[120] facilitates that communication.
At its core, this case is about the Secretary’s decision to change the immigration classification of millions of illegal aliens on a class-wide basis. The states properly maintain that DAPA’s grant of lawful presence and accompanying eligibility for benefits is a substantive rule that must go through notice and comment, before it imposes substantial costs on them, and that DAPA is substantively contrary to law. The federal courts are fully capable of adjudicating those disputes.
VI.
Because the interests that Texas seeks to protect are within the INA’s zone of interests, and judicial review is available, we address whether Texas has established a substantial likelihood of success on its claim that DAPA must be submitted for notice and comment. The United States urges that DAPA is exempt as an “in *171 terpretative rule[ ], general statement ] of policy, or rule[] of agency organization, procedure, or practice.” 5 U.S.C. § 553(b)(A). “In contrast, if a rule is ‘substantive,’ the exemption is inapplicable, and the full panoply of notice-and-comment requirements must be adhered to scrupulously. The ‘APA’s notice and comment exemptions must be narrowly construed.’ ”[121]
A.
The government advances the notion that DAPA is exempt from notice and comment as a policy statement.[122] We evaluate two criteria to distinguish policy statements from substantive rules: whether the rule (1) “impose[s] any rights and obligations” and (2) “genuinely leaves the agency and its decision-makers free to exercise discretion.”[123] There is some overlap in the analysis of those prongs “because ‘[i]f a statement denies the deci-sionmaker discretion in the area of its coverage ... then the statement is binding, and creates rights or obligations.’ ” [124] “While mindful but suspicious of the agency’s own characterization, we ... focus[] primarily on whether the rule has binding effect on agency discretion or severely restricts it.”[125] “[A]n agency pronouncement will be considered binding as a practical matter if it either appears on its face to be binding, or is applied by the agency in a way that indicates it is binding.” Gen. Elec., 290 F.3d at 383 (citation omitted).
Although the DAPA Memo facially purports to confer discretion,[126] the dis- *172 trict court determined that “[n]othing about DAPA ‘genuinely leaves the agency and its [employees] free to exercise discretion,' ”[127] a factual finding that we review for clear error. That finding was partly informed by analysis of the implementation of DACA, the precursor to DAPA.[128]
Like the DAPA Memo, the DACA Memo instructed agencies to review applications on a case-by-case basis and exercise discretion, but the district court found that those statements were “merely pretext” [129] because only about 5% of the 723,-000 applications accepted for evaluation had been denied,[130] and “[djespite a request by the [district] [c]ourt, the [government's counsel did not provide the number, if any, of requests that were denied [for discretionary reasons] even though the applicant met the DACA criteria....”[131] The finding of pretext was also based on a declaration by Kenneth Palinkas, the president of the union representing the USCIS employees processing the DACA applications, that “DHS management has taken multiple steps to ensure that DACA applications are simply rubberstamped if the *173 applicants meet the necessary criteria”;[132] DACA’s Operating Procedures, which “contain[ ] nearly 150 pages of specific instructions for granting or denying deferred action”;[133] and some mandatory language in the DAPA Memo itself.[134]. In denying the government’s motion for a stay of the injunction, the district court further noted that the President had made public statements suggesting that in reviewing applications pursuant to DAPA, DHS officials who “don’t follow the policy” will face “consequences,” and “they’ve got a problem.” [135]
The DACA and DAPA Memos purport to grant discretion, but a rule can be binding if it is “applied by the agency in a way that indicates it is binding,”[136] and there was evidence from DACA’s implementation that DAPA’s discretionary language was pretextual. For a number of reasons, any extrapolation from DACA must be done carefully.[137]
*174 First, DACA involved issuing benefits to self-selecting applicants, and persons who expected to be denied relief would seem unlikely to apply. But the issue of self-selection is partially mitigated by the finding that “the [g]overnment has publicly declared that it will make no attempt to enforce the law against even those who are denied deferred action (absent extraordinary circumstances).” Dist. Ct. Op., 86 F.Supp.3d at 663 (footnote omitted).
Second, DACA and DAPA are not identical: Eligibility for DACA was restricted to a younger and less numerous population,[138] which suggests that DACA applicants are less likely to have backgrounds that would warrant a discretionary denial. Further, the DAPA Memo contains additional discretionary criteria: Applicants must not be “an enforcement priority as reflected in the [Prioritization Memo]; and [must] present no other factors that, in the exercise of discretion, makes the grant of deferred action inappropriate.” DAPA Memo at 4. But despite those differences, there are important similarities: The Secretary “direct[ed] USCIS to establish a process, similar to DACA, for exercising prosecutorial discretion,” id. (emphasis added), and there was evidence that the DACA application process itself did not allow for discretion, regardless of the rates of approval and denial.[139]
Instead of relying solely on the lack of evidence that any DACA application had been denied for discretionary reasons, the district court found pretext for additional reasons. It observed that “the ‘Operating Procedures’ for implementation of DACA *175 contains nearly 150 pages of specific instructions for granting or denying deferred action to applicants” and that “[denials are recorded in a ‘check the box’ standardized form, for which USCIS personnel are provided templates. Certain denials of DAPA must be sent to a supervisor for approval!, and] there is no option for granting DAPA to an individual who does not meet each criterion.” Dist. Ct. Op., 86 F.Supp.3d at 669 (footnotes omitted). The finding was also based on the declaration from Palinkas that, as with DACA, the DAPA application process itself would preclude discretion: “[R]outing DAPA applications through service centers instead of field offices ... created an application process that bypasses traditional in-person investigatory interviews with trained USCIS adjudications officers” and “prevents officers from conducting case-by-case investigations, undermines officers’ abilities to detect fraud and national-security risks, and ensures that applications will be rubber-stamped.” See id. at 609-10 (citing that declaration).
As the government points out, there was conflicting evidence on the degree to which DACA allowed for discretion. Donald Neufeld, the Associate Director for Service Center Operations for USCIS, declared that “deferred action under DACA is a ... case-specific process” that “necessarily involves the exercise of the agency’s discretion,” and he purported to identify several instances of discretionary denials.[140] Although Neufeld stated that approximately 200,000 requests for additional evidence had been made upon receipt of DACA applications, the government does not know the number, if any, that related to discretionary factors rather than the objective criteria. Similarly, the government did not provide the number of cases that service-center officials referred to field offices for interviews.[141]
Although the district court did not make a formal credibility determination or hold an evidentiary hearing on the conflicting statements by Neufeld and Palinkas, the record indicates that it did not view the Neufeld declaration as creating a material factual dispute.[142] Further, the govern *176 ment did not seek an evidentiary hearing, nor does it argue on appeal that it was error not to conduct such a hearing. Reviewing for clear error, we conclude that the states have established a substantial likelihood that DAPA would not genuinely leave the agency and its employees free to exercise discretion.
B.
A binding rule is not required to undergo notice and comment if it is one “of agency organization, procedure, or practice.” § 553(b)(A). “[T]he substantial impact test is the primary means by which [we] look beyond the label ‘procedural’ to determine whether a rule is of the type Congress thought appropriate for public participation.”[143] “An agency rule that modifies substantive rights and interests can only be nominally procedural, and the exemption for such rules of agency procedure cannot apply.”[144] DAPA undoubtedly meets that test — conferring lawful presence on 500,000 illegal aliens residing in Texas forces the state to choose between spending millions of dollars to subsidize driver’s licenses and amending its statutes.[145]
The District of Columbia Circuit applies a more intricate test for distinguishing between procedural and substantive rules.[146] The court first looks at the “ ‘effect on those interests ultimately at stake in the agency proceeding.’ Hence, agency rules that impose ‘derivative,’ ‘incidental,’ or ‘mechanical’ burdens upon regulated individuals are considered procedural, rather than substantive.”[147]
Further, “a procedural rule generally may not ‘encode [] a substantive value judgment or put[ ] a stamp of approval or disapproval on a given type of behavior,’ ”[148] but “the fact that the agency’s decision was based on a value judgment about procedural efficiency does not convert the resulting rule into a substantive one.”[149] “A corollary to this principle is that rules are generally considered procedural so long as they do not ‘change the *177 substantive standards by which the [agency] evaluates’ applications which seek a benefit that the agency has the power to provide.”[150]
Applying those considerations to DAPA yields the same result as does our substantial-impact test. Although the burden imposed on Texas is derivative of conferring lawful presence on beneficiaries, DAPA establishes “ ‘the substantive standards by which the [agency] evaluates applications’ which seek a benefit that the agency [purportedly] has the power to provide” — a critical fact requiring notice and comment.[151]
Thus, DAPA is analogous to “the rules [that] changed the substantive criteria for [evaluating station allotment counter-proposals]” in Reeder v. FCC, 865 F.2d 1298, 1305 (D.C.Cir.1989) (per curiam), holding that notice and comment was required. In contrast, the court in JEM Broadcasting, 22 F.3d at 327, observed that “[t]he critical fact here, however, is that the ‘hard look’ rules did not change the substantive standards by which the FCC evaluates license applications,” such that the rules were procedural. Further, receipt of DAPA benefits implies a “stamp of approval” from the government and “encodes a substantive value judgment,” such that the program cannot be considered procedural. Am. Hosp, 834 F.2d at 1047.
C.
Section 553(a)(2) exempts rules from notice and comment “to the extent that there is involved ... a matter relating to ... public property, loans, grants, benefits, or contracts.” To avoid “carv[ing] the heart out of the notice provisions of Section 553”,[152] the courts construe the public-benefits exception very narrowly as applying only to agency action that “clearly and directly relate[s] to ‘benefits’ as that word is used in section 553(a)(2).”[153]
DAPA does not “clearly and directly” rélate to public benefits as that term is used in § 553(a)(2). That subsection suggests that “rulemaking requirements for agencies managing benefit programs are ... voluntarily imposed,” [154] but USCIS — the. agency tasked with evaluating DAPA applications — is not an agency managing benefit programs. Persons who meet the DAPA criteria do not directly receive the kind of public benefit that has been recognized, or was likely to have been included, under this exception.[155]
*178 In summary, the states have established a substantial likelihood of success on the merits of their procedural claim. We proceed to address whether, in addition to that likelihood on the merits, the states make the same showing on their substantive APA claim.[156]
VII.
A “reviewing court shall ... hold unlawful and, set aside agency action ... found to be — (A) arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law ... [or] (C) in excess of statutory jurisdiction, authority, or limitations, or short of statutory right.” 5 U.S.C. § 706(2). Although the district court enjoined DAPA solely on the basis of the procedural APA claim, “it is an elementary proposition, and the supporting cases too numerous to cite, that this court may affirm the district court’s judgment on any grounds supported by the record.” [157] Therefore, as an alternate and, additional ground for affirming the injunction, we address this substantive issue, which was fully briefed in the district court.[158]
Assuming arguendo that Chevron[159] applies,[160] we first “ask whether *179 Congress has ‘directly addressed the precise question at issue.’ ”[161] It has. “Federal governance of immigration and alien status is extensive and complex.” Arizona v. United States, 132 S.Ct. at 2499. The limited ways in which illegal aliens can lawfully reside in the United States reflect Congress’s concern that “aliens have been applying for and receiving public benefits from Federal, State, and local governments at increasing rates,” 8 U.S.C. § 1601(3), and that “[i]t is a compelling government interest to enact new rules for eligibility and sponsorship agreements in order to assure that aliens be self-reliant in accordance with national immigration policy,” § 1601(5).
In specific and detailed provisions, the INA expressly and carefully provides legal designations allowing defined classes of aliens to be lawfully present[162] and confers eligibility for “discretionary relief allowing [aliens in deportation pro-eeedings] to remain in the country.”[163] Congress has also identified narrow classes of aliens eligible for deferred action, including certain petitioners for immigration status under the Violence Against Women Act of 1994,[164] immediate family members of lawful permanent residents (“LPRs”) killed by terrorism,[165] and immediate family members of LPRs killed in combat and granted posthumous citizenship.[166] Entirely absent from those specific classes is the group of 4.3 million illegal aliens who would be eligible for lawful presence under DAPA were it not enjoined. See DAPA Memo at 4.
Congress has enacted an intricate process for illegal aliens to derive a lawful immigration classification from their children’s immigration status: In general, an applicant must (i) have a U.S. citizen child who is at least twenty-one years old, (ii) leave the United States, (iii) wait ten years, and then (iv) obtain one of the limit *180 ed number of family-preference visas from a United States consulate.[167] Although DAPA does not confer the full panoply of benefits that a visa gives, DAPA would allow illegal aliens to receive the benefits of lawful presence solely on account of their children’s immigration status without complying with any of the requirements, enumerated above, that Congress has deliberately imposed. DAPA requires only that prospective beneficiaries “have ... a son or daughter who is a U.S. citizen or lawful permanent resident” — without regard to the age of the child — and there is no need to leave the United States or wait ten years[168] or obtain a visa.[169] Further, the INA does not contain a family-sponsorship process for parents of an LPR child,[170] but DAPA allows a parent to derive lawful presence from his child’s LPR status.
The INA authorizes cancellation of removal and adjustment of status if, inter alia, “the alien has been physically present in the United States for a continuous period of not less than 10 years immediately preceding the date of such application” and if “removal would result in exceptional and extremely unusual hardship to the alien’s spouse, parent, or child, who is a citizen of the United States or an alien lawfully admitted for permanent residence.” 8 U.S.C. § 1229b(b)(l)(A) (emphasis added). Although LPR status is more substantial than is lawful presence, § 1229b(b)(l) is the most specific delegation of authority to the Secretary to change the immigration classification of removable aliens that meet only the DAPA criteria and do not fit within the specific categories set forth in § 1229b (b) (2) — (6).
Instead of a ten-year physical-presence period, DAPA grants lawful presence to persons who “have continuously resided in the United States since before January 1, 2010,” and there is no requirement that removal would result in exceptional and extremely unusual hardship. DAPA Memo at 4. Although the Secretary has discretion to make immigration decisions based on humanitarian grounds, that discretion is conferred only for particular family relationships and specific forms of relief — none of which includes granting lawful presence, on the basis of a child’s immigration status, to the class of aliens that would be eligible for DAPA.[171]
The INA also specifies classes of aliens *181 eligible[172] and ineligible[173] for work authorization, including those “eligible for work authorization and deferred action” — with no mention of the class of persons whom DAPA would make eligible for work authorization. Congress “ ‘forcefully’ made combating the employment of illegal aliens central to ‘[t]he policy of immigration law,’ ”[174] in part by “establishing an extensive ‘employment verification system,’ designed to deny employment to aliens who ... are not lawfully present in the United States.”[175]
The INA’s careful employment-authorization scheme “protects] against the displacement of workers in the United States,”[176] and a “primary purpose in restricting immigration is to preserve jobs for American workers.”[177] DAPA would dramatically increase the number of aliens eligible for work authorization, thereby undermining Congress’s stated goal of closely guarding access to work authorization and preserving jobs for those lawfully in the country.
DAPA would make 4.3 million otherwise removable aliens eligible for lawful presence, employment authorization, and associated benefits, and “we must be guided to a degree by common sense as to the manner in which Congress is likely to delegate a policy decision of such economic and political magnitude to an administrative agency.”[178] DAPA undoubtedly implicates “question[s] of deep ‘economic and political significance’ that [are] central to this statutory scheme; had Congress wished to assign that decision to an agency, it surely would have done so expressly.”[179] But *182 assuming arguendo that Chevron applies and that Congress has not directly addressed the precise question at hand, we would still strike down DAPA as an unreasonable interpretation that is “manifestly contrary” to the INA. See Mayo Found., 562 U.S. at 53, 131 S.Ct. 704.
The dissent, relying on Texas Rural Legal Aid v. Legal Services Corp., 940 F.2d 685, 694 (D.C.Cir.1991), theorizes that our analysis is nothing but an application of the expressio unius est exclusio alterius[180] canon of construction, which the dissent claims is of limited utility in administrative law. Dissent at 215-16. The dissent’s observation is astray, however, because our statutory analysis does not hinge on the expressio unius maxim.
Moreover, the Supreme Court and this court have relied on expressio unius in deciding issues of administrative law. While noting “the limited usefulness of the expressio unius doctrine in the administrative context,”[181] some courts have declined to apply it mostly because they find it unhelpful for the specific statute at issue.[182] On other occasions, both our circuit and the Supreme Court have employed the canon in addressing administrative law.[183] Nor has the District of Columbia Circuit expressly foreclosed use of the canon on questions of statutory interpretation by agencies.[184] Our distinguished dissenting colleague, in fact, relied on expressio unius to uphold a decision of the Board of Immigration Appeals, concluding that the Equal Access to Justice Act did not provide for fee-shifting in proceedings before the Board. See Hodge v. Dep’t of Justice, 929 F.2d 153, 157 n. 11 (5th Cir.1991) (King, J.).
For the authority to implement DAPA, the government relies in part on 8 *183 U.S.C. § 1324a(h)(3),[185] a provision that does not mention lawful presence or deferred action, and that is listed as a “[m]is-cellaneous” definitional provision expressly limited to § 1324a, a section concerning the “Unlawful employment of aliens” — an exceedingly unlikely place to find authorization for DAPA.[186] Likewise, the broad grants of authority in 6 U.S.C. § 202(5),[187] 8 U.S.C. § 1103(a)(3),[188] and 8 U.S.C. § 1103(g)(2)[189] cannot reasonably be construed as assigning “decisions of vast ‘economic and political significance,’ ”[190] such as DAPA, to an agency.[191]
*184 The interpretation of those provisions that the Secretary advances would allow him to grant lawful presence and work authorization to any illegal alien in the United States — an untenable position in light of the INA’s intricate system of immigration classifications and employment eligibility. Even with “special deference” to the Secretary,[192] the INA flatly does not permit the reclassification of millions of illegal aliens as lawfully present and thereby make them newly eligible for a host of federal and state benefits, including work authorization.
Presumably because DAPA is not authorized by statute, the United States posits that its authority is grounded in historical practice, but that “does not, by itself, create power,”[193] and in any event, previous deferred-action programs are not analogous to DAPA. “[M]ost ... discretionary deferrals have been done on a country-specific basis, usually in response to war, civil unrest, or natural disasters,”[194] but DAPA is not such a program. Likewise, many of the previous programs were bridges from one legal status to another,[195] whereas DAPA awards lawful presence to persons who have never had a legal status[196] and may never receive one.[197]
*185 Although the “Family Fairness” program did grant voluntary departure to family members of legalized aliens while they “wait[ed] for a visa preference number to become available for family members,” that program was interstitial to a statutory legalization scheme.[198] DAPA is far from interstitial: Congress has repeatedly declined to enact the Development, Relief, and Education for Alien Minors Act (“DREAM Act”),[199] features of which closely resemble DACA and DAPA.
Historical practice that is so far afield from the challenged program sheds no light on the Secretary’s authority to implement DAPA. Indeed, as the district court recognized, the President explicitly stated that “it was the failure of Congress to enact such a program that prompted him ... to ‘change the law.’ ” [200] At oral argument, and despite being given several opportunities, the attorney for the United States was unable to reconcile that remark with the position that the government now takes. And the dissent attempts to avoid the impact of the President’s statement by accusing the district court and this panel majority of “relying ... on selected excerpts of the President’s public statements.” Dissent at 203, 208 n. 41.
*186 The dissent repeatedly claims that congressional silence has conferred on DHS the power to act. E.g., Dissent at 214-15. To the contrary, any such inaction cannot create such power:
“[DJeference is warranted only when Congress has left a gap for the agency to fill pursuant to an express or implied ‘delegation of authority to the agency.’ ” Chevron[,] 467 U.S. at 843-44[, 104 S.Ct. 2778]. To suggest, as the [agency] effectively does, that Chevron step two is implicated at any time a statute does not expressly negate the existence of a claimed administrative power ... is both flatly unfaithful to the principles of administrative law ... and refuted by precedent.... Were courts to presume a delegation of power absent an express withholding of such power, agencies would enjoy virtually limitless hegemony, a result plainly out of keeping with Chevron and quite likely with the Constitution as well.
Ethyl Corp. v. EPA, 51 F.3d 1053, 1060 (D.C.Cir.1995).
Through the INA’s specific and intricate provisions, “Congress has ‘directly addressed the precise question at issue.’ ” Mayo Found., 562 U.S. at 52, 131 S.Ct. 704. As we have indicated, the INA prescribes how parents may derive an immigration classification on the basis of then-child’s status and which classes of aliens can achieve deferred action and eligibility for work authorization. DAPA is foreclosed by Congress’s careful plan; the program is “manifestly contrary to the statute”[201] and therefore was properly enjoined.[202]
VIII.
The states have satisfied the other requirements for a preliminary injunction. They have demonstrated “a substantial threat of irreparable injury if the injunction is not issued.” Sepulvado, 729 F.3d at 417 (quoting Byrum, 566 F.3d at 445). DAPA beneficiaries would be eligible for driver’s licenses and other benefits, and a substantial number of the more than four million potential beneficiaries — many of whom live in the plaintiff states — would take advantage of that opportunity. The district court found that retracting those benefits would be “substantially difficult— if not impossible,” Dist. Ct. Op., 86 F.Supp.3d at 673, and the government has given us no reason to doubt that finding.
The states have shown “that the threatened injury if the injunction is denied outweighs any harm that will result if the injunction is granted.” Sepulvado, 729 F.3d at 417 (quoting Byrum, 566 F.3d at 445). The states have alleged a concrete threatened injury in the form of millions of dollars of losses.
The harms the United States has identified are less substantial. It claims that the injunction “obstructs a core Executive prerogative” and offends separation-of-powers and federalism principles. Those alleged harms are vague, and the principles the government cites are more likely to be affected by the resolution of the case on the merits than by the injunction.
Separately, the United States postulates that the injunction prevents DHS from *187 effectively prioritizing illegal aliens for removal. But the injunction “does not enjoin or impair the Secretary’s ability to marshal his assets or deploy the resources of the DHS [or] to set priorities,” including selecting whom to remove first, see Dist. Ct. Op., 86 F.Supp.3d at 678, and any inefficiency is outweighed by the major financial losses the states face.
The government also complains that the injunction imposes administrative burdens because' DHS has already leased office space and begun hiring employees to implement DAPA. Such inconveniences are common incidental effects of injunctions, and the government could have avoided them by delaying preparatory work until the litigation was resolved.[203] Finally, the government reasonably speculates that the injunction burdens DAPA beneficiaries and their families and discourages them from cooperating with law-enforcement officers and paying taxes. But those are burdens that Congress knowingly created, and it is not our place to second-guess those decisions.
The states have also sufficiently established that “an injunction will not dis-serve the public interest.” Sepulvado, 729 F.3d at 417 (quoting Byrum, 566 F.3d at 445). This factor overlaps considerably with the previous one, and most of the same analysis applies.[204] The main difference is that, instead of relying on their financial interests, the states refer to the public interest in protecting separation of powers by curtailing unlawful executive action.
Although the United States cites the public interest in maintaining separation of powers and federalism by avoiding judicial and state interference with a legitimate executive function, there is an obvious difference: The interest the government has identified can be effectively vindicated after a trial on the merits. The interest the states have identified cannot be, given the difficulty of restoring the status quo ante if DAPA were to be implemented.[205] The public interest easily favors an injunction.
IX.
 The government claims that the nationwide scope of the injunction is an abuse of discretion and requests that it be confined to Texas or the plaintiff states. But the Constitution requires “an uniform Rule of Naturalization”;[206] Congress has instructed that “the immigration laws of *188 the United States should be enforced vigorously and uniformly" [207] and the Supreme Court has described immigration policy as “a comprehensive and unified system.” [208] Partial implementation of DAPA would “detract[] from the ‘inte.grated scheme of regulation’ created by Congress,” [209] and there is a substantial likelihood that a geographically-limited injunction would be ineffective because DAPA beneficiaries would be free to move among states.
Furthermore, the Constitution vests the District Court with “the judicial Power of the United States.”[210] That power is not limited to the district wherein the court sits but extends across the country. It is not beyond the power of a court, in appropriate circumstances, to issue a nationwide injunction.[211]
“We expect Congress to speak clearly if it wishes to assign to an agency decisions of vast ‘economic and political significance.’ ” Util. Air, 134 S.Ct. at 2444 (citation omitted). Agency announcements to the contrary are “greet[ed] ... with a measure of skepticism.” ■ Id.
The district court did not err and most assuredly did not abuse, its discretion. The order granting the preliminary injunction is AFFIRMED.

. This opinion refers to the defendants collectively as "the United States” or "the government” unless otherwise indicated.

. We refer to the plaintiffs collectively as "the states,” but as appropriate we refer only to -r u .. . , j Texas because it is the only state that the district court determined to have standing.

. We find it unnecessary, at this early stage of the proceedings, to address or decide the challenge based on the Take Care Clause.

. We cite the district court's opinion as "Dist. Ct. Op., 86 F.Supp.3d at-.”

. Our dedicated colleague has penned a care-¡Y1,*886114' with Twhich larSely but respect- ^ gree- 14 18 ^ell-researched, however, and bears a careful read.

. Memorandum from Janet Napolitano, Sec'y, Dep't of Homeland Sec., to David Aguilar, Acting Comm’r, U.S. Customs and Border Prot., et al. 1 (June 15, 2012) (the "DACA Memo”), http://www.dhs.gOv/xlibrary/assets/s *147 1-exercising-prosecutorial-discretion-individuals-who-came-to-us-as-children.pdf.

. Id. (stating that an individual may be considered if he "[1] came to the United States under the age of sixteen; [2] has continuously resided in the United States for a[t] least five years preceding [June. 15, 2012] and is present in the United States on [June 15]; [3] is currently in school, has graduated from high school, has obtained a general education development certificate, or is an honorably discharged veteran of the [military]; [4] has not been convicted of a felony offense, a significant misdemeanor offense, multiple misdemeanor offenses, or otherwise poses a threat to national security or public safety; and [5] is not above the age of thirty”).

. Id. at 2.

. Id. at 3.

. Memorandum from Jeh Johnson, Sec'y, Dep’t of Homeland Sec., to Leon Rodriguez, Dir., USCIS, et al. 3-4 (Nov. 20, 2014), http:// www.dhs.gov/sites/defaull/files/publications/ 14_1120_memo_deferred_action.pdf.

. Id. at 3. The district court enjoined implementation of the following three DACA expansions, and they are included in the term "DAPA” in this opinion: (1) the "age restriction excluding] those who were older than 31 on the date of the [DACA] announcement ... will no longer apply,” id.; (2) "[t]he period for which DACA and the accompanying employment authorization is granted will be extended to three-year increments, rather than the current two-year increments,” id.; (3) “the eligibility cut-off date by which a DACA applicant must have been in the United States should be adjusted from June 15, 2007 to January 1, 2010,” id. at 4. Dist. Ct. Op., 86 F.Supp.3d at 677-78 & n. 111.

.DAPA Memo at 4 (directing that individuals may be considered for deferred action if they “[1] have, on [November 20, 2014], a son or daughter who is a U.S. citizen or lawful permanent resident; [2] have continuously resided in the United States since before January 1, 2010; [3] are physically present in the United States on [November 20, 2014], and at the time of making a request for consideration of deferred action with USCIS; [4] have no lawful status on [November 20, 2014]; [5] are not an enforcement priority as reflected in the November 20, 2014 Policies for the Apprehension, Detention and Removal of Undocumented Immigrants Memorandum; and [6] present no other factors that, in the exercise of discretion, makes the grant of deferred action inappropriate”).

. Id. at 2 (emphasis added).

. Although "[a]s a general rule, it is not a crime for a removable alien to remain present in the United States,” it is a civil offense. Arizona v. United States, - U.S. -, 132 S.Ct. 2492, 2505, 183 L.Ed.2d 351 (2012); see 8 U.S.C. §§ 1182(a)(9)(B)(i), 1227(a)(1)(A)-(B). This opinion therefore refers to such persons as "illegal aliens”:
The usual and preferable term in [American English] is illegal alien. The other forms have arisen as needless euphemisms, and should be avoided as near-gobbledygook. The problem with undocumented is that it is intended to mean, by those who use it in this phrase, "not having the requisite documents to enter or stay in a country legally.” But the word strongly suggests "unaccounted for” to those unfamiliar with this quasi-legal jargon, and it may therefore obscure the meaning.
More than one writer has argued in favor of undocumented alien ... [to] avoid[ ] the implication that one’s unauthorized presence in the United States is a crime.... Moreover, it is wrong to equate illegality with criminality, since many illegal acts are not criminal. Illegal alien is not an opprobrious epithet: it describes one present in a country in violation of the immigration laws (hence "illegal”).
Bryan A. Garner, Garner's Dictionary of Legal Usage 912 (Oxford 3d ed.2011) (citations omitted). And as the district court pointed out, "it is the term used by the Supreme Court in its latest pronouncement pertaining to this area of the law.” Dist. Ct. Op., 86 F.Supp.3d at 605 n. 2 (citing Arizona v. United States, - U.S. -, 132 S.Ct. 2492, 2497, 183 L.Ed.2d 351 (2012)). “[I]legal alien has going for it both history and well-documented, generally accepted use.” Matthew Sal-zwedel, The Lawyer’s Struggle to Write, 16 Scribes Journal of Legal Writing 69, 76 (2015).

. Those provisions reflect Congress’s concern that "aliens have been applying for and receiving public benefits from Federal, State, and local governments at increasing rates” and that "[i]t is a compelling government interest to remove the incentive for illegal immigration provided by the availability of public benefits.” 8 U.S.C. § 1601. Moreover, the provisions incorporate a national policy that "aliens within the Nation's borders not depend on public resources to meet their needs” and that "[s]elf-sufficiency has been a basic principle of United States immigration law since this country’s earliest immigration statutes.” Id.

. Brief for Appellants at 48-49 (citing 8 U.S.C. § 1611 (b)(2) — (3)).

. Brief for Appellants at 49 (citation omitted) (citing 42 U.S.C. § 405(c)(1)(B), (4), (5)(A)-(J); 8 C.F.R. § 1.3(a)(4)(vi); 20 C.F.R. §§ 422.104(a)(2), 422.105(a)).

. Dist. Ct. Op., 86 F.Supp.3d at 654 n. 64; see also 26 U.S.C. § 32(c)(1)(E), (m) (stating that eligibility for earned income tax credit is limited to individuals with Social Security numbers); 20 C.F.R. §§ 422.104(a)(2), 422.107(a), (e)(1).

. Tex Transp. Code § 521.142(a) ("An applicant who is not a citizen of the United States must present ... documentation issued by the appropriate United States agency that authorizes the applicant to he in the United States before the applicant may be issued a driver’s license.” (emphasis added)).

. Tex. Lab.Code § 207.043(a)(2) (emphasis added); see also 26 U.S.C. § 3304(a)(14)(A) (approval of state laws making compensation not payable to aliens unless they are “lawfully present for purposes of performing such services” (emphasis added)).

. Sepulvado v. Jindal, 729 F.3d 413, 417 (5th Cir.2013).

. Id. (quoting Byrum v. Landreth, 566 F.3d 442, 445 (5th Cir.2009)).

. Id. (quoting Janvey v. Alguire, 647 F.3d 585, 591-92 (5th Cir.2011)).

. We did not reach this issue in Crane v. Johnson, 783 F.3d 244 (5th Cir.2015). There, we concluded that neither the State of Mississippi nor Immigration and Customs Enforcement ("ICE”) agents and deportation officers had standing to challenge DACA. Id. at 255. We explicitly determined that Mississippi had waived the theory that Texas now advances:
In a letter brief filed after oral argument, Mississippi put forward three new arguments in support of its standing, [including] (1) the cost of issuing driver’s licenses to DACA’s beneficiaries.... Because Mississippi failed to provide evidentiary support on these arguments and failed to make these arguments in their opening brief on appeal and below, they have been waived.
Id. at 252 n. 34.

. The dissent, throughout, cleverly refers to the states, more than forty times, as the "plaintiffs,” obscuring the fact that they are sovereign states (while referring to the defendants as the "government”). See Dissent, passim.

. The dissent attempts to diminish the considerable significance of the "special solicitude” language, which, to say the least, is inconvenient to the United States in its effort to defeat standing. The dissent protests that it is "only a single, isolated phrase” that "appears only once.” Dissent at 193-94.
The dissent, however, avoids mention of the Court's explanation that "[i]t is of considerable relevance that the party seeking review here is a sovereign State.” Massachusetts v. EPA, 549 U.S. at 518, 127 S.Ct. 1438. In light of that enlargement oh the "special solicitude” phrase, it is obvious that being a state greatly matters in the standing inquiry, and it makes no difference, in the words of the dissent, "whether the majority means that states are afforded a relaxed standing inquiry by virtue of their statehood or whether their statehood, in [and] of itself, helps confer standing.” Dissent at 193.

.Massachusetts v. EPA, 549 U.S. at 516-17, 127 S.Ct. 1438 (citations omitted).

. Id., at 519-20, 127 S.Ct. 1438 (alteration in original) (citation omitted) (quoting 42 U.S.C. § 7521(a)(1)).

. Id. at 516, 127 S.Ct. 1438.

. See infra part IV.

. Massachusetts v. EPA, 549 U.S. at 516-17, 127 S.Ct. 1438 (citation omitted).

. 5 U.S.C. § 702.

. See New Mexico ex rel. Richardson v. Bureau of Land Mgmt., 565 F.3d 683, 694, 696 n. 13 (10th Cir.2009) (holding that New Mexico was entitled to “special solicitude” where one of its claims was based on the APA); Wyoming ex rel. Crank v. United States, 539 F.3d 1236, 1241-42 (10th Cir.2008) (holding that Wyoming was entitled to special solicitude where its only claim was based on the APA).

.See Heckler v. Chaney, 470 U.S. 821, 831, 105 S.Ct. 1649, 84 L.Ed.2d 714 (observing that "refusals to take enforcement steps” generally are subject to agency discretion, and the “presumption is that judicial review is not available.”).

. See, e.g., Tex. Transp. Code § 521.142(a) (specifying the requirements for licenses), .181 (providing for the issuance of licenses), .421(a) (setting the fees for licenses); Dist. Ct. Op., 86 F.Supp.3d at 616-17 (finding that Texas subsidizes its licenses).

. Tex. Office of Pub. Util. Counsel v. FCC, 183 F.3d 393, 449 (5th Cir.1999) (quoting Alfred L. Snapp & Son, Inc. v. Puerto Rico ex rel. Barez, 458 U.S. 592, 601, 102 S.Ct. 3260, 73 L.Ed.2d 995 (1982)).

. See id.

. See, e.g., Crank, 539 F.3d at 1242; Alaska v. U.S. Dep't of Transp., 868 F.2d 441, 443-44 (D.C.Cir.1989); Ohio ex rel. Celebrezze v. U.S. Dep’t of Transp., 766 F.2d 228, 232-33 (6th Cir.1985); cf. Diamond v. Charles, 476 U.S. 54, 62, 106 S.Ct. 1697, 90 L.Ed.2d 48 (1986) (commenting that "a State has standing to defend the constitutionality of its statute” but not relying on that principle).

. See Crank, 539 F.3d at 1241-42; Celebrezze, 766 F.2d at 232-33; cf. Maine v. Taylor, 477 U.S. 131, 137, 106 S.Ct. 2440, 91 L.Ed.2d 110 (1986) (observing in another context that "a State clearly has a legitimate interest in the continued enforceability of its own statutes”).

. Virginia ex rel. Cuccinelli v. Sebelius, 656 F.3d 253, 269 (4th Cir.2011).

. Id. at 270.

. See Crank, 539 F.3d at 1241-42 (reasoning that Wyoming was entitled to "special solicitude” where its asserted injury was interference with the enforcement of state law).

. See generally Arizona v. United States, 132 S.Ct. at 2498-2501.

. See Villas at Parkside Partners v. City of Farmers Branch, 726 F.3d 524, 536 (5th Cir.2013) (en banc).

. Massachusetts v. EPA, 549 U.S. at 519, 127 S.Ct. 1438.

. The Ninth Circuit has suggested that, see Ariz. Dream Act Coal. v. Brewer, 757 F.3d 1053, 1061-67 (9th Cir.2014), but we need not decide the issue.

. Massachusetts v. EPA, 549 U.S. at 519, 127 S.Ct. 1438.

. See id.

. See Chaney, 470 U.S. at 823, 105 S.Ct. 1649; United States v. Cox, 342 F.2d 167, 170 (5th Cir.1965) (en banc).

. See Linda R.S. v. Richard D., 410 U.S. 614, 615-16, 93 S.Ct. 1146, 35 L.Ed.2d 536 (1973).

. See Henderson v. Stalder, 287 F.3d 374, 384 (5th Cir.2002) (Jones, J., concurring).

. See Arizona v. United States, 132 S.Ct. at 2497; Sure-Tan, Inc. v. NLRB, 467 U.S. 883, 886, 104 S.Ct. 2803, 81 L.Ed.2d 732 (1984); Plyler v. Doe, 457 U.S. 202, 205, 102 S.Ct. 2382, 72 L.Ed.2d 786 (1982); Fiallo v. Bell, 430 U.S. 787, 788, 97 S.Ct. 1473, 52 L.Ed.2d 50 (1977); Mathews v. Diaz, 426 U.S. 67, 69, 96 S.Ct. 1883, 48 L.Ed.2d 478 (1976). In the other case the government cites, "we assume[d], without deciding, that the plaintiffs have standing.” Texas v. United States, 106 F.3d 661, 664 n. 2 (5th Cir.1997).

. We address justiciability in part V.B, infra.

. Ariz. State Legislature, 135 S.Ct. at 2665 n. 12 (final alteration in original) (quoting Raines v. Byrd, 521 U.S. 811, 819-20, 117 S.Ct. 2312, 138 L.Ed.2d 849 (1997)).

. See Dist. Ct. Op., 86 F.Supp.3d at 616.

. See Tex. Dep’t Of Pub. Safety, Verifying Lawful Presence 4 (2013), https://www.txdps. state.tx.us/DriverLicense/documents/verifying LawfulPresence.pdf (listing an acceptable document for a "Person granted deferred action” as “Immigration documentation with an alien number or 1-94 number”); DAPA

. See Tex. Dep’t Of Pub. Safety, supra note 56, at 3 (stating that an "Employment Authorization Document" is sufficient proof of lawful presence); Dist. Ct. Op., 86 F.Supp.3d at 616 n. 14 (explaining that "[ejmployment authorization” is "a benefit that will be available to recipients of DAPA”).

. See Dist. Ct. Op., 86 F.Supp.3d at 617. Some of those costs are directly attributable to the United States. Under the REAL ID Act of 2005, Pub.L. No. 109-13, div. B, 119 Stat. 302 (codified as amended in scattered sections of Titles 8 and 49 U.S.C.), Texas must verify each applicant's immigration status through DHS, see 6 C.F.R. § 37.11(g), .13(b)(1), or the state’s licenses will no longer be valid for a number of purposes, including commercial air travel without a secondary form of identification, REAL ID Enforcement in Brief, U.S. Department of Homeland Security (July 27, 2015), http://www.dhs.gov/real-id-enforcement-brief. Texas pays an average of 75<t per applicant to comply with that mandate. See Dist. Ct. Op., 86 F.Supp.3d at 617.

. See, e.g., L.A. Haven Hospice, Inc. v. Sebelius, 638 F.3d 644, 656-59 (9th Cir.2011) (holding that a hospice had standing to challenge a regulation that allegedly increased its costs in some ways even though the regulation may have saved it money in other ways or in other fiscal years); Sutton v. St. Jude Med. S.C., Inc., 419 F.3d 568, 570-75 (6th Cir.2005) (concluding that a patient had standing to sue designers, manufacturers, and distributors of a medical device implanted in his body because it allegedly increased risk of medical p'roblems even though it had not malfunctioned and had benefited him); Markva v. Haveman, 3l7 F.3d 547, 557-58 (6th Cir. *156 2003) (deciding that grandparents had standing to challenge a requirement that they pay more for Medicaid benefits than would similarly situated parents, even though the grandparents may have received more of other types of welfare benefits).

. 13A Charles Alan Wright.et al., Federal Practice and Procedure § 3531.4, at 147 (3d ed.2015) (footnote omitted).

. NCAA v. Governor of N.J., 730 F.3d 208, 223 (3d Cir.2013).

. Tex. Office of Pub. Util. Counsel v. FCC, 183 F.3d 393, 449 (5th Cir.1999) (quoting Alfred L. Snapp & Son, Inc. v. Puerto Rico ex rel. Barez, 458 U.S. 592, 601, 102 S.Ct. 3260, 73 L.Ed.2d 995 (1982)).

. See Texas v. United States, 497 F.3d 491, 497 (5th Cir.2007). The dissent theorizes that if “forcing Texas to change its laws would be an injury because states have a ‘sovereign interest in the “power to create and enforce a legal code,” ’ ” then Pennsylvania v. New Jersey, 426 U.S. 660, 96 S.Ct. 2333, 49 L.Ed.2d 124 (1976) (per curiam), must be wrongly decided. Dissent at 195 n. 16. The dissent posits that Pennsylvania (there) and Texas (here) faced pressure to change their laws, so their Article III standing vel non must be the same. But the dissent ignores a key distinction between Pennsylvania v. New Jersey and the instant case: As we explain below, the pressure that Pennsylvania faced to change its laws was self-inflicted; Texas’s is not.

. See, e.g., Crank, 539 F.3d at 1242; Alaska, 868 F.2d at 443-44; Celebrezze, 766 F.2d at 232-33.

. It follows that the dissent’s unsubstantiated claim that "Pennsylvania, like Texas, tied its law to that of anothér sovereign, whereas Wyoming did not ” (emphasis added), is obvious error. Dissent at 195 n. 16. The dissent ignores our explication of Texas’s and Wyoming's policy goals. We do not assert that those states cannot change their laws to avoid injury from changes in the laws of another state. Rather, we demonstrate that Texas and Wyoming cannot both change their laws to avoid injury from amendments to another sovereign’s laws and achieve their policy goals.
For example, although, as we have said but the dissent overlooks, Wyoming easily could have avoided injury from changes in Oklahoma’s laws by abandoning entirely its tax on coal extraction, it would have surrendered its policy goal of taxing extraction in the first place. Similarly, Texas could avoid financial loss by increasing fees, not subsidizing its licenses, or perhaps not issuing licenses to lawfully present aliens, but the consequence *159 would be that by taking those actions Texas would have abandoned its fully permissible policy goal of providing subsidized licenses only to those who are lawfully present in the United States a — policy that, as we have repeatedly pointed out, Texas instituted well before the Secretary designed DACA or DAPA.
In essence, the dissent would have us issue the following edict to Texas: “You may avoid injury to the pursuit of your policy goals — . injury resulting from a change in federal immigration law — by changing your laws to pursue different goals or eliminating them altogether. Therefore, your injuries are self-inflicted.” Presumably the dissent would have liked for the Supreme Court to have issued a similar edict to Wyoming, which sought to tax the extraction of coal and had no way both to continue taxing extraction and to avoid being affected by Oklahoma’s laws that reduced demand for that coal. See Dissent at 195-96.

. See Certain State Fiscal Matters; Providing Penalties, ch. 4, sec. 72.03, § 521.101 (f— 2), 2011 Tex. Gen. Laws 5254, 5344 (codified at Tex. Transp. Code § 521.142(a)).

. See Massachusetts v. EPA, 549 U.S. at 523-24, 127 S.Ct. 1438; id. at 540-45, 127 S.Ct. 1438 (Roberts, C.J., dissenting) (questioning whether Massachusetts had lost land at all as a result of climate change and whether the EPA's decision had contributed meaningfully to any erosion).

. See, e.g., Amnesty Int’l, 133 S.Ct. at 1147-50 (explaining that, for a provision of the Foreign Intelligence Surveillance Act to have resulted in the monitoring of the plaintiffs' communications, the Attorney General and the Director of National Intelligence would have had to authorize the collection of the communications, the Foreign Intelligence Surveillance Court would have had to approve the government’s request, and the government would have had to intercept the communications successfully); Whitmore v. Arkansas, 495 U.S. 149, 156-60, 110 S.Ct. 1717, 109 L.Ed.2d 135 (1990) (reasoning that, for a death-row inmate's decision not to appeal to have harmed the plaintiff, who was another death row inmate, the court hearing any appeal would have had to rule in a way favorable to the plaintiff).

.See, e.g., Already, LLC v. Nike, Inc., - U.S. -, 133 S.Ct. 721, 731, 184 L.Ed.2d 553 (2013) (rejecting the theory “that a market participant is injured for Article III purposes whenever a competitor benefits from something allegedly unlawful — whether a trademark, the awarding of ‘ a contract, a landlord-tenant arrangement, or so on.”); McConnell v. FEC, 540 U.S. 93, 228, 124 S.Ct. 619, 157 L.Ed.2d 491 (2003) (commenting that the plaintiffs, candidates for public office, were unable to compete not because of increased hard-money limits but instead because of their personal decisions not to accept large contributions), overruled on other grounds by Citizens United v. FEC, 558 U.S. 310, 130 S.Ct. 876, 175 L.Ed.2d 753 (2010); Allen v. Wright, 468 U.S. 737, 756-59, 104 S.Ct. 3315, 82 L.Ed.2d 556 (1984) (observing that any lack of opportunity for the plaintiffs’ children to attend racially integrated public schools was attributable not only to tax exemptions for discriminatory private schools but also to the decisions of private-school administrators and other parents), abrogated on other grounds by Lexmark Int’l, Inc. v. Static Control Components, Inc., - U.S. -, 134 S.Ct. 1377, 188 L.Ed.2d 392 (2014).

. See Massachusetts v. EPA, 549 U.S. at 546, 127 S.Ct. 1438 (Roberts, C.J., dissenting) ("Every little bit helps, so Massachusetts can sue over any little bit.”).

. The dissent responds to this by asserting that "[t]he majority’s observation that this suit involves 'policy disagreements masquerading as legal claims’ is also telling.” Dissent at 202. That of course is not what our sentence (which is not a description of the suit at hand) says at all.

.Clarke v. Sec. Indus. Ass’n, 479 U.S. 388, 396, 107 S.Ct. 750, 93 L.Ed.2d 757 (1987) (quoting Ass’n of Data Processing Serv. Orgs., Inc. v. Camp, 397 U.S. 150, 153, 90 S.Ct. 827, 25 L.Ed.2d 184 (1970)).

. Amnesty Int'l, 133 S.Ct. at 1147 (emphasis omitted) (quoting Defs. of Wildlife, 504 U.S. at 565 n. 2, 112 S.Ct. 2130).

. See Dist. Ct. Op., 86 F.Supp.3d at 616-17 (discussing the potential loss and citing a portion of a declaration addressing those expenses).

. See Hosanna-Tabor Evangelical Lutheran Church & Sch. v. EEOC, -U.S. -, 132 S.Ct. 694, 710, 181 L.Ed.2d 650 (2012) (stating, in response to an alleged "parade of horribles,” that “[tjhere will be time enough to address ... other circumstances” in future cases without altering the Court's present conclusion).

. Match-E-Be-Nash-She-Wish Band of Pottawatomi Indians v. Patchak, - U.S. -, 132 S.Ct. 2199, 2210, 183 L.Ed.2d 211 (2012) (quoting Data Processing, 397 U.S. at 153, 90 S.Ct 827).

. Id. (quoting Sec. Indus. Ass’n, 479 U.S. at 399, 107 S.Ct. 750).

. Id. (quoting Sec. Indus. Ass’n, 479 U.S. at 399-400, 107 S.Ct. 750).

. Id. (quoting Sec. Indus. Ass'n, 479 U.S. at 399, 107 S.Ct. 750).

. The INA “established a ‘comprehensive federal statutory scheme for regulation of immigration and naturalization’ and set ‘the terms and conditions of admission to the country and the subsequent treatment of aliens lawfully in the country.’ ” Chamber of Commerce of U.S. v. Whiting, 563 U.S. 582, 131 S.Ct. 1968, 1973, 179 L.Ed.2d 1031 (2011) (quoting DeCanas v. Bica, 424 U.S. 351, 353, 359, 96 S.Ct. 933, 47 L.Ed.2d 43 (1976)).

. United States v. Alabama, 691 F.3d 1269, 1298 (11th Cir.2012) (emphasis added) (citing 8 U.S.C. § 1621).

. Chaney, 470 U.S. at 828, 105 S.Ct. 1649 (quoting 5 U.S.C. §§ 702, 704). The government does not dispute that DAPA is a "final agency action.” See Lujan v. Nat’l Wildlife Fed’n, 497 U.S. 871, 882, 110 S.Ct. 3177, 111 L.Ed.2d 695 (1990).

. Reno v. Catholic Soc. Servs., Inc., 509 U.S. 43, 63-64, 113 S.Ct. 2485, 125 L.Ed.2d 38 (1993) (quoting McNary v. Haitian Refugee Ctr., Inc., 498 U.S. 479, 496, 111 S.Ct. 888, 112 L.Ed.2d 1005 (1991); Abbott Labs. v. Gardner, 387 U.S. 136, 141, 87 S.Ct. 1507, 18 L.Ed.2d 681 (1967)).

. Mach Mining, 135 S.Ct. at 1651 (quoting Dunlop v. Bachowski, 421 U.S. 560, 567, 95 S.Ct. 1851, 44 L.Ed.2d 377 (1975)).

. With limited exceptions, "no court shall have jurisdiction to hear any cause or claim by or on behalf of any alien arising from the decision or action by the Attorney General to commence proceedings, adjudicate cases, or execute removal orders against any alien under this chapter.” 8 U.S.C. § 1252(g).

. AAADC, 525 U.S. at 482, 119 S.Ct. 936. "We are aware of no other instance in the United States Code in which language such as this has been used to impose a general jurisdictional limitation....” Id.

. Id. (quoting § 1252(g)).

. See AAADC, 525 U.S. at 486-87, 119 S.Ct. 936 (listing “8 U.S.C. § 1252(a)(2)(A) (limiting review of any claim arising from the inspection of aliens arriving in the United States), [ (B) ] (barring review of denials of discretionary relief authorized by various statutory provisions), [ (C) ] (barring review of final removal orders against criminal aliens), [ (b)(4)(D) ] (limiting review of asylum determinations)”); see also, e.g., 8 U.S.C. §§ 1182(a)(9)(B)(v) (barring review of waiver of reentry restrictions); 1226a(b)(l) (limiting review of detention of terrorist aliens); 1229c(e) (barring review of regulations limiting eligibility for voluntary departure), (f) (limiting review of denial of voluntary departure).

.E.g., 8 U.S.C. §§ 1613(c)(2)(G), 1621(b)(4), 1641.

. Arizona v. United States, 132 S.Ct. at 2498.

. Id. at 2500.

. See, e.g., Gulf Restoration Network v. McCarthy, 783 F.3d 227, 235 (5th Cir.2015) (Higginbotham, J.) ("[TJhere is a 'strong presumption,’ subject to Congressional language, that 'action taken by a federal agency is reviewable in federal court.' ” (quoting RSR Corp. v. Donovan, 747 F.2d 294, 299 n. 23 (5th Cir.1984))).

.Perales v. Casillas, 903 F.2d 1043, 1047 (5th Cir.1990) (alteration in original) (citation omitted).

. Arizona v. United States, 132 S.Ct. at 2499 ("A principal feature of the removal system is the broad discretion exercised by immigration officials. Federal officials, as an initial matter, must decide whether it makes sense to pursue removal at all.” (citation omitted)).

. The dissent misleadingly declares, "In other words, deferred action itself is merely a brand of 'presumptively unreviewable’ prose-cutorial discretion.” Dissent at 196. The dissent attributes that statement to this panel majority when in fact, as shown above, we accurately cite the statement as coming from the Secretary.

. Chaney, 470 U.S. at 838, 105 S.Ct. 1649 (citation omitted); see Vigil, 508 U.S. at 190-91, 113 S.Ct. 2024.

. Chaney, 470 U.S. at 832, 105 S.Ct. 1649.

. See Memorandum from Jeh Johnson, Sec’y, Dep’t of Homeland Sec., to Thomas Winkowski, Acting Dir., U.S. Immigration and Customs Enforcement, et al. (Nov. 20, 2014) (the "Prioritization Memo”), http:// www.dhs.gov/sites/default/files/publications/ 14_1120_memo_prosecutorial_discretion.pdf.

. See supra part I.A. DAPA would also toll the duration of the recipients' unlawful presence under the INA’s reentry bars, which would benefit aliens who receive lawful presence as minors because the unlawful-presence clock begins to run only at age eighteen. See 8 U.S.C. § 1182(a)(9)(B)(iii)(I). Most adult beneficiaries would be unlikely to benefit from tolling because, tp be eligible for DAPA, one must have continuously resided in the United States since before January 1, 2010, and therefore would likely already be subject to the reentry bar for aliens who have "been unlawfully present in the United States for one year or more.” § 1182(a)(9)(B)(i)(II); see § 1182(a)(9)(C)(i)(I).

. See supra part I.A.

. Cf Memorandum from James Cole, Deputy Att'y Gen., to All U.S. Attorneys (Aug. 29, 2013) (the "Cole Memo”), http://www.justice. gov/iso/opa/resources/305201382913 2756857467.pdf. The Cole Memo establishes how prosecutorial discretion will be used in relation to marihuana enforcement under the Controlled Substances Act. Unlike the DAPA Memo, it does not direct an agency to grant eligibility for affirmative benefits to anyone *167 engaged in unlawful conduct. As we have explained, to receive public benefits, aliens accorded lawful presence must satisfy additional criteria set forth in the various benefit schemes, but they nevertheless become eligible to satisfy those criteria. That eligibility is itself a cognizable benefit.

. Supplemental Brief for Appellants at 16. But see 8 U.S.C. § 1201(i) ("After the issuance of a visa or other documentation to any alien, the consular officer or the Secretary of State may at any time, in his discretion, revoke such visa or other documentation.”); § 1227(a)(1)(B) (providing that any alien "whose nonimmigrant visa ... has been revoked under section 1201(i) of this title, is deportable”).

. Supplemental Brief for Appellants at 16 (emphasis omitted).

. Wayte v. United States, 470 U.S. 598, 608, 105 S.Ct 1524, 84 L.Ed.2d 547 (1985) (quoting United States v. Batchelder, 442 U.S. 114, 125, 99 S.Ct. 2198, 60 L.Ed.2d 755 (1979)).

. AAADC, 525 U.S. at 484, 119 S.Ct. 936 (emphasis added) (quoting 6 Charles Gordon, Stanley Mailman & Stephen Yale-Loehr, Immigration Law and Procedure § 72.03[2][h] (1998)); accord Johns v. Dep’t of Justice, 653 F.2d 884, 890 (5th Cir.1981) (“The Attorney General also determines whether (1) to refrain from (or, in administrative parlance, to defer in) executing an outstanding order of deportation, or (2) to stay the order of deportation.” (footnote omitted)); see also Yoon v. INS, 538 F.2d 1211, 1213 (5th Cir.1976) (per curiam).

. AAADC, 525 U.S. at 484, 119 S.Ct. 936 (quoting Gordon, Mailman & Yale-Loehr, supra note 105).

. DAPA Memo at 2 (emphasis added).

. Chaney, 470 U.S. at 832, 105 S.Ct. 1649. Because the challenged portion of DAPA's deferred-action program is not an exercise of enforcement discretion, we do not reach the issue of whether the presumption against review of such discretion is rebutted. See id. at 832-34-, 105 S.Ct. 1649; Adams v. Richardson, 480 F.2d 1159, 1161-62 (D.C.Cir.1973) (en banc) (per curiam).

. Perales, 903 F.2d at 1051 (quoting Robbins v. Reagan, 780 F.2d 37, 45 (D.C.Cir.1985) (per curiam)).

. See infra part VII.

. "An alien who has been granted deferred action, an act of administrative convenience to the government which gives some cases lower priority, [may be able to obtain work authorization upon application] if the alien establishes an economic necessity for employment.” 8 C.F.R. § 274a.l2(c)(14).

. The class of aliens eligible for DAPA is not among those classes of aliens identified by Congress as eligible for deferred action and work authorization. See infra part VII.

. See Tex. Dep’t of Pub. Safety, Verifying Lawful Presence, supra note 56.

. Lexmark, 134 S.Ct. at 1386 (quoting Sprint Commc’ns, Inc. v. Jacobs, - U.S. -, 134 S.Ct. 584, 591, 187 L.Ed.2d 505 (2013)).

. See Sprint Commc’ns, 134 S.Ct. at 590 ("Federal courts, it was early and famously said, have 'no more right to decline the exercise of jurisdiction which is given, than to usurp that which is not given.' " (quoting Cohens v. Virginia, 19 U.S. (6 Wheat.) 264, 404, 5 L.Ed. 257 (1821))).

. Texas v. United States, 106 F.3d at 664; see also Sure-Tan, 467 U.S. at 897, 104 S.Ct. 2803 ("[Pjrivate persons ... have no judicially cognizable interest in procuring enforcement of the immigration laws....”); Fiallo, 430 U.S. at 792, 97 S.Ct. 1473 ("[T]he power to expel or exclude aliens [is] a fundamental sovereign attribute exercised by the Government’s political departments largely immune from judicial control.” (quoting Shaughnessy v. United States ex rel. Mezei, 345 U.S. 206, 210, 73 S.Ct. 625, 97 L.Ed. 956 (1953))).

. See Brief for Appellees at 2 ("[T]he district court’s injunction does not touch-and this lawsuit has never challenged-the Executive’s separate memorandum establishing three categories for removal prioritization, or any decision by the Executive to forego a removal proceeding.”).

. The main thrust of the dissent could be summarized as claiming that "[fit’s Congress’s fault.” The President apparently agrees: As explained by the district court, "it was the failure of Congress to enact such a program that prompted [the President] ... to ‘change the law.’ ” See infra note 200. The dissent opens by blaming Congress for insufficient funding-to-wit, "decades of congression *170 al appropriations decisions, which require DHS ... to de-prioritize millions of removable each year due to these resource constraints.” Dissent at 191 (footnote omitted).
The dissent's insistent invocation of what it perceives as Congress’s inadequate funding is regrettable and exposes the weakness of the government's legal position. See, e.g., Dissent at 188-89 ("unless and until more resources are made available by Congress”); id. ("if Congress is able to make more resources for removal available”); id. at 190 ("given the resource constraints faced by DHS”); id. (“to maximize the resources that can be devoted to such ends”); id. at 191 ("decades of congressional appropriations decisions”); id. at 191 ("due to these resource constraints”); id. at 192 n. 9 ("if Congress were to substantially increase the amount of funding”); id. at 196 ("DHS’s limited resources”); id. at 214 n. 55 ("the decades-long failure of Congress to fund”); id. at [218] ("Congress’s choices as to the level of funding for immigration enforcement”).
The facts, not commentary on political decisions, are what should matter. Thus the dissent's notion that "this case essentially boils down to a policy dispute,” Dissent at 201, far misses the mark and avoids having to tackle the hard reality — for the government — of existing law. Similarly unimpressive is the dissent's resort to hyperbole. E.g., Dissent at 194 ("[t]he majority's breathtaking expansion of state standing”); id. at 195 ("the majority's sweeping 'special solicitude’ analysis”); id. at 194-95 n. 15 ("the sweeping language the majority uses today”); id. at 213 n. 54 (“this radical theory of standing”); id. at 216 n. 61 (“The majority’s ruling ... is potentially devastating.”).
The dissent also claims' that despite limited funding, "DHS ... has been removing individuals from the United States in record numbers.” Dissent at 200. At the very least, the statistics on which the dissent relies are highly misleading. Although DHS claims that a record-high of 0.44 million aliens were deported in 2013, it arrives at that number by using only "removals” (which are deportations by court order) per year and ignoring "returns” (which are deportations achieved without court order). If, more accurately, one counts total removals and returns by both ICE and the Border Patrol, deportations peaked at over 1.8 million in 2000 and plunged to less than half — about 0.6 million— in 2013. In that thirteen-year interim, the number of aliens deported per court directive (that is, removed) roughly doubled from about 0.2 million to 0.44 million. The total number of deportations is at its lowest level since the mid-1970's. U.S. Dep't of Homeland Sec., 2013 Yearbook of Immigration Statistics 103tbl.39 (2014), http://www.dhs.gov/sites/ default/files/publications/ois_yb_2013_0.pdf.

. Arizona v. United States, 132 S.Ct. at 2508.

. U.S. Steel Corp. v. EPA, 595 F.2d 207, 214 (5th Cir.1979).

. Prof Is & Patients for Customized Care v. Shalala, 56 F.3d 592, 595 (5th Cir.1995) (footnote omitted) (quoting United States v. Picciotto, 875 F.2d 345, 347 (D.C.Cir.1989)).

. The government does not dispute that DAPA is a "rule,” which is defined by the APA as "an agency statement of general or particular applicability and future effect designed to implement, interpret, or prescribe law or policy or describing the organization, procedure, or practice requirements of an agency and includes [various substantive agency functions] or practices bearing on any of the foregoing.” 5 U.S.C. § 551(4).

. Prof Is & Patients, 56 F.3d at 595 (quoting Cmty. Nutrition Inst. v. Young, 818 F.2d 943, 946 (D.C.Cir.1987) (per curiam)); see also Vigil, 508 U.S. at 197, 113 S.Ct. 2024 (describing general statements of policy "as ‘statements issued by an agency to advise the public prospectively of the manner in which the agency proposes to exercise a discretionary power.’ ” (quoting Chrysler Corp. v. Brown, 441 U.S. 281, 302 n. 31, 99 S.Ct. 1705, 60 L.Ed.2d 208 (1979))); Brown Express, Inc. v. United States, 607 F.2d 695, 701 (5th Cir.1979) ("A general statement of policy is a statement by an administrative agency announcing motivating factors the agency will consider, or tentative goals toward which it will aim, in determining the resolution of a [sjubstantive question of regulation.”).

. Gen. Elec. Co. v. EPA, 290 F.3d 377, 382 (D.C.Cir.2002) (quoting McLouth Steel Prods. Corp. v. Thomas, 838 F.2d 1317, 1320 (D.C.Cir.1988)).

. Prof'ls & Patients, 56 F.3d at 595 (footnote omitted); accord id. ("[W]e are to give some deference, ‘albeit "not overwhelming,’ ” to the agency’s characterization of its own rule.” (quoting Cmty. Nutrition Inst., 818 F.2d at 946)); Phillips Petroleum Co. v. Johnson, 22 F.3d 616, 619 (5th Cir.1994) ("This court, however, must determine the category into which the rule falls: '[T]he label that the particular agency puts upon its given exercise of administrative power is not, for our purposes, conclusive; rather it is what the agency does in fact.’ ” (alteration in original) (quoting Brown Express, 607 F.2d at 700)).

. See Crane, 783 F.3d at 254-55. In Crane, we held that the plaintiff ICE agents and deportation officers had not "demonstrated the concrete and particularized injury required to give them standing” to challenge DACA, id. at 247, because, inter alia, they had not alleged a sufficient factual basis for their claim that an employment action against them was "certainly impending” if they "ex *172 ercise[d] [their] discretion to detain an illegal alien,” id. at 255. That conclusion was informed by the express delegation of discretion on the face of the DACA Memo and by the fact that no sanctions or warnings had yet been issued. Id. at 254-55. We did not hold that DACA was an unreviewable exercise of prose-cutorial discretion or that the DACA criteria did not have binding or severely restrictive effect on agency discretion. See id. at 254-55.

. Dist. Ct. Op., 86 F.Supp.3d at 670 (second alteration in original) (quoting Prof is & Patients, 56 F.3d at 595).

. Id. at 669-70. See 3 Jacob A. Stein et al„ Administrative Law § 15.05[3] (2014) ("In general, the agency’s past treatment of a rule will often indicate its nature.”).

. Dist. Ct. Op., 86 F.Supp.3d at 669 n. 101.

. Id. at 609; see id. (noting that "[i)n response to a Senate inquiry, the USCIS told the Senate that the top four reasons for denials were: (1) the applicant used the wrong form; (2) the applicant failed to provide a valid signature; (3) the applicant failed to file or complete Form 1-765 or failed to enclose the fee; and (4) the applicant was below the age of fifteen and thus ineligible to participate in the program”); id. at 669 n. 101 ("[A]ll were denied for failure to meet the criteria (or 'rejected' for technical filing errors, errors in filling out the form or lying on the form, and failures to pay fees), or for fraud.”).
Relying on the Neufeld declaration, the dissent tries to make much of the distinction between denials and rejections. Dissent at 209. The district court did in fact mistakenly write "denials” (used to describe applications refused for failure to meet the criteria) in the above quoted passage where the USCIS response actually said "rejections” (applications refused for procedural defects). USCIS reported that approximately 6% of DACA applicants were rejected and that an additional 4% were denied. USCIS does not draw a distinction between denials of applicants who did not meet the criteria and denials of those who met the criteria but were refused deferred action as a result of a discretionary choice.
USCIS could not produce any applications that satisfied all of the criteria but were refused deferred action by an exercise of discretion. Id. at 669 n. 101 ("[A]ll were denied for failure to meet the criteria or 'rejected' for technical filing errors, errors in filling out the form or lying on the form, and failures to pay fees, or for fraud.”). Given that the government offered no evidence as to the bases for other denials, it was not error — clear or otherwise — for the district court to conclude that DHS issued DACA denials under mechanical formulae.

.Dist. Ct. Op., 86 F.Supp.3d at 609. The parties had ample opportunity to inform the district court, submitting over 200 pages of briefing over a two-month period with more than 80 exhibits. The court held a hearing on the motion for a preliminary injunction, heard extensive argument from both sides, and "specifically asked for evidence of individuals who had been denied for reasons other than not meeting the criteria or technical errors with the form and/or filing.” Id. at 669 n. 101.

. Dist. Ct. Op., 86 F.Supp.3d at 609-10.

. Id. at 669 (footnote omitted). For example, the DACA National Standard Operating Procedures ("SOP”) specifically directs officers on which evidence an applicant is required to submit, what evidence is to be considered, "the weight to be given” to evidence, and the standards of proof required to grant or deny an application. U.S. Dep’t of Homeland Sec., National Standard Operating Procedures: DACA 42 (2012). To elaborate: An affidavit alone may not support an application, and DACA applicants must prove education and age criteria by documentary evidence. Id. at 8-10. The SOP also mandates, however, that "[o]fficers will NOT deny a DACA request solely because the DACA re-questor failed to submit sufficient evidence with the request ... officers will issue a [Request for Evidence (RFE) ] ... whenever possible.” Id. at 42.
DHS internal documents further provide that “a series of RFE [ ] templates have been developed and must be used,” and those documents remind repeatedly that "[u]se of these RFE templates is mandatory." (Emphasis added.) And "[w]hen an RFE is issued, the response time given shall be 87 days.” SOP at 42.
These specific evidentiary standards and RFE steps imposed by the SOP are just examples the district court had before it when it concluded that DACA and DAPA “severely restrict! ]" agency discretion. Prof Is & Patients, 56 F.3d at 595. Far from being clear error, such a finding was no error whatsoever.

. Dist. Ct. Op., 86 F.Supp.3d at 648-49, 671 n. 103. There the district court exhibited its keen awareness of the DAPA Memo by quoting the following from it:
I [the Secretary] hereby direct USCIS to establish a process, similar to DACA.... Applicants must file.... Applicants must also submit.... [Applicants] shall also be eligible.... Deferred action granted pursuant to the program shall be for a period of three years.... As with DACA, the above criteria are to be considered for all individuals .... ICE and CBP are instructed to immediately begin identifying persons in their custody, as well as newly encountered individuals, who meet the above criteria.... ICE is further instructed to review pending removal cases.... The USCIS process shall also be available to individuals subject to final orders of removal.
Id. at 611-12 (páragraph breaks omitted.) This detailed explication of the DAPA Memo flies in the face of the dissent’s unjustified critique that the district court "eschew[ed] the plain language of the [DAPA] Memorandum.” Dissent at 207.

. Texas v. United States, No. B-14—254, 2015 WL 1540022, at *3 (S.D.Tex. Apr. 7, 2015).

. Gen. Elec., 290 F.3d at 383; accord McLouth Steel, 838 F.2d at 1321-22 (reviewing historical conformity as part of determination of whether rule was substantive or non-binding policy, despite language indicating that it was policy statement); id. at 1321 (“More critically than EPA’s language [,] ... its later conduct applying it confirms its binding character.”).

. The dissent, citing National Mining Ass’n v. McCarthy, 758 F.3d 243, 253 (D.C.Cir.2014), criticizes the states and the district court for enjoining DAPA without “an early snapshot” of its implementation. Dissent at *174 207. First, the dissent overlooks a fundamental principle of preliminary injunctions: An injunction is of no help if one must wait to suffer injury before the court grants it. United States v. Emerson, 270 F.3d 203, 262 (5th Cir.2001) ("[T]he injury need not have been inflicted when application [for the injunction] is made or be certain to occur[.]”).
Second, the dissent assumes the conclusion of National Mining — that the agency action in question is not subject to pre-enforcement review — is applicable here and asserts that we need an "early snapshot” of DAPA enforcement. The two cases are easily distinguished. The court found EPA’s "Final Guidance” exempt from pre-enforcement review because it had "no legal impact.” National Mining, 758 F.3d at 253; see id., at 252 ("The most important factor concerns the actual legal effect (or lack thereof) of the agency action on regulated entities.... As a legal matter, the Final Guidance is meaningless ... [and] has no legal impact.”)
DAPA, by contrast, has an effect on regulated entities (i.e. illegal aliens). DAPA removes a categorical bar to illegal aliens who are receiving state and federal benefits, so it places a cost on the states. The states are not required to suffer the injury of that legal impact before seeking an injunction. See id. 252.

. Approximately 1.2 million illegal aliens are eligible for DACA and 4.3 million for DAPA. Dist. Ct. Op., 86 F.Supp.3d at 609, 670.

. Despite these differences and the dissent’s protestations to the contrary (see, e.g., Dissent at 208-10), DACA is an apt comparator to DAPA. The district court considered the DAPA Memo’s plain language, in which the Secretary equates the DACA and DAPA procedure, background checks, fee exemptions, eligibility for work authorizations, durations of lawful presence and work authorization, and orders DHS to establish, for DAPA, processes similar to those for DACA:
In order to align the DACA program more closely with the other deferred action authorization outlined below, ... I hereby direct USCIS to establish a process, similar to DACA.... There will be no fee waivers, and like DACA.... As with DACA, the above criteria are to be considered for all individuals ....
DAPA Memo at 4-5. See Dist. Ct. Op., 86 F.Supp.3d at 610-11. The district court’s conclusion that DACA and DAPA would be applied similarly, based as it was in part on the memorandum’s plain language, was not clearly erroneous and indeed was not error under any standard of review.

. The states properly maintain that those denials were not discretionary but instead were required because of failures to meet DACA's objective criteria. For example, Neu-feld averred that some discretionary denials occurred because applicants "pose[d] a public safety risk,” "[were] suspected of gang membership or gang-related activity, had a series of arrests without convictions” or "ongoing criminal investigations." As the district court aptly noted, however, those allegedly discretionary grounds fell squarely within DACA's objective criteria because DACA explicitly incorporated the enforcement priorities articulated in the DACA Operation Instructions and the memorandum styled Policies for Apprehension, Detention, and Removal of Undocumented Immigrants. Dist. Ct. Op., 86 F.Supp.3d at 669 n. 101.

. The United States was also given the chance to show that it planned to put DAPA into effect in a manner different from how it implemented DACA; it failed to take advantage of that opportunity. Further, after assuring the district court that "[USCIS] does not intend to entertain requests for deferred action under the challenged policy until February 18, 2015,” the government later admitted to having approved dozens of DAPA applications and three-year employment authorization to more than 100,000 aliens satisfying the original DACA criteria; the government could not demonstrate which applicants, if any, were rejected on purely discretionary grounds, as distinguished from failure to meet the requirements set forth in the memoranda.

.After a hearing on the preliminary injunction, the government filed a sur-reply that included the Neufeld declaration. The government did not seek an evidentiary hearing, but the states requested one if the "new declarations create a fact dispute of material consequence to the motion.” No such hearing was held, and the court cited the Palinkas declaration favorably, e.g., Dist. Ct. Op., 86 F.Supp.3d at 609-10, 613 n. 13, 669 n. 101, • yet described other sources as providing insufficient detail, e.g., id. at 669 n. 101.

. U.S. Dep't of Labor v. Kast Metals Corp., 744 F.2d 1145, 1153 (5th Cir.1984); accord Stein, supra, § 15.05[5] ("Procedural and practice rules have been distinguished from substantive rules by applying the substantial impact test.”).

. Kast Metals, 744 F.2d at 1153; accord Brown Express, 607 F.2d at 701-03.

. See Avoyelles Sportsmen’s League, Inc. v. Marsh, 715 F.2d 897, 908 (5th Cir.1983) ("[Substantive] rules ... grant rights, impose obligations, or produce other significant effects on private interests. They also narrowly constrict the discretion of agency officials by largely determining the issue addressed.” (omission in original) (quoting Batterton v. Marshall, 648 F.2d 694 (D.C.Cir.1980))).

. Compare Raspar Wire Works, Inc. v. Sec’y of Labor, 268 F.3d 1123, 1132 (D.C.Cir.2001) (recognizing that the D.C. Circuit "has expressly rejected” "the Fifth Circuit’s ‘substantial impact’ standard for notice and comment requirements”), with City of Arlington v. FCC, 668 F.3d 229, 245 (5th Cir.2012) ("The purpose of notice-and-comment rulemaking is to assure fairness and mature consideration of rules having a substantial impact on those regulated." (quoting United States v. Johnson, 632 F.3d 912, 931 (5th Cir.2011))), aff'd on other grounds, - U.S.-, 133 S.Ct. 1863, — L.Ed.2d (2013), and Phillips Petroleum, 22 F.3d at 620 (reaffirming substantial-impact test announced in Brown Express).

. Nat’l Sec. Counselors v. CIA, 931 F.Supp.2d 77, 107 (D.D.C.2013) (citation omitted) (quoting Neighborhood TV Co. v. FCC, 742 F.2d 629, 637 (D.C.Cir.1984); Am. Hosp. Ass’n v. Bowen, 834 F.2d 1037, 1051 (D.C.Cir.1987)).

. Nat’l Sec. Counselors, 931 F.Supp.2d at 107 (alterations in original) (quoting Am. Hosp., 834 F.2d at 1047).

. Id. (quoting James V. Hurson Assocs. v. Glickman, 229 F.3d 277, 282 (D.C.Cir.2000)).

. Id. (alteration in original) (quoting JEM Broad. Co. v. FCC, 22 F.3d 320, 327 (D.C.Cir.1994)).

. Id. (first alteration in original) (quoting JEM Broad., 22 F.3d at 327).

. Hous. Auth. of Omaha v. U.S. Hous. Auth., 468 F.2d 1, 9 (8th Cir.1972) ("The exemptions of matters under Section 553(a)(2) relating to 'public benefits,’ could conceivably include virtually every activity of government. However, since an expansive reading of the exemption clause could easily carve the heart out of the notice provisions of Section 553, it is fairly obvious that Congress did not intend for the exemptions to be interpreted that broadly.").

. Baylor Univ. Med. Ctr. v. Heckler, 758 F.2d 1052, 1061 (5th Cir.1985).

. Alcaraz v. Block, 746 F.2d 593, 611 (9th Cir.1984).

. See e.g., Vigil, 508 U.S. at 184, 196, 113 S.Ct. 2024 (clinical services provided by Indian Health Service for handicapped children); Hoerner v. Veterans Admin., No. 88-3052, 1988 WL 97342, at *1-2 & n. 10 (4th Cir. July 8, 1988) (per curiam) (unpublished) (benefits ' for veterans); Baylor Univ. Med. Ctr.,' 758 F.2d at 1058-59 (Medicare reimbursement regulations issued by Secretary of Health and Human Services); Rodway v. U.S. Dep’t of Agric., 514 F.2d 809, 813 (D.C.Cir.1975) (food stamp allotment regulations). The Departments of Agriculture, Health and- Human Ser *178 vices, and Labor have waived the exemption for matters relating to public property, loans, grants, benefits, or contracts. See 29 C.F.R. § 2.7 (Department of Labor); Public Participation in Rule Making, 36 Fed.Reg. 13,804, 13,804 (July 24, 1971) (Department of Agriculture); Public Participation in Rule Making, 36 Fed.Reg. 2532, 2532 (Jan. 28, 1971) (Department of Health and Human Services, then known as Health, Education, and Welfare).

. We reiterate that DAPA is much more than a nonenforcement policy, which presumptively would be committed to agency discretion. Therefore, even where á party has standing and is within the requisite zone of interests, a traditional nonenforcement policy would not necessarily be subject to notice and comment just because DAPA must undergo notice-and-comment review.

. Palmer ex rel. Palmer v. Waxahachie Indep. Sch. Dist., 579 F.3d 502, 506 (5th Cir.2009) (citation and internal quotation marks omitted).

. "This circuit follows the rule that alternative holdings are binding precedent and not obiter dictum." United States v. Potts, 644 F.3d 233, 237 n. 3 (5th Cir.2011) (citation and internal quotation marks omitted). At oral argument, the parties agreed that no further factual development is needed to resolve the substantive APA challenge.

. Chevron, U.S.A., Inc. v. Nat. Res. Def. Council, Inc., 467 U.S. 837, 104 S.Ct. 2778, 81 L.Ed.2d 694 (1984).

.“[T]he fact that the Agency previously reached its interpretation through means less formal than 'notice and comment’ rulemaking does not automatically deprive that interpretation of the judicial deference otherwise its due.” Barnhart v. Walton, 535 U.S. 212, 221, 122 S.Ct. 1265, 152 L.Ed.2d 330 (2002) (citation omitted). Instead, we consider factors such as “the interstitial nature of the legal question, the related expertise of the Agency, the importance of the question to administration of the statute, the complexity of that administration, and the careful consideration the Agency has given the question over a long period of time....” Id. We need not decide whether DHS’s interpretation satisfies that test, however, because, as we explain, the agency cannot prevail even under Chevron.
Chevron deference requires the courts to accept an agency’s reasonable construction of a statute as long as it is “not patently inconsistent with the statutory scheme.” Am. Airlines, Inc. v. Dep’t of Transp., 202 F.3d 788, 813 (5th Cir.2000). As explained below, we decide that, assuming Chevron deference does apply, DAPA is not a reasonable construction of the INA, because it is "manifestly contrary” to the INA statutory scheme. Mayo Found. for Med. Educ. & Research v. United States, 562 U.S. 44, 53, 131 S.Ct. 704, 178 L.Ed.2d 588 (2011).
An agency construction that is manifestly contrary to a statutory scheme could not be persuasive under the test in Skidmore v. Swift & Co., 323 U.S. 134, 65 S.Ct. 161, 89 L.Ed. 124 (1944), a test that affords agency constructions less deference than does Chevron. *179 See Gonzales v. Oregon, 546 U.S. 243, 256, 126 S.Ct. 904, 163 L.Ed.2d 748 (2006) (providing that under Skidmore, an “interpretation is entitled to respect only to the extent it has the power to persuade"). Therefore, our decision to forego discussion of the Walton factors is sensible. See Griffon v. U.S. Dep't of Health & Human Servs., 802 F.2d 146, 148 n. 3 (5th Cir.1986) (noting that where an interpretive rule is unreasonable, "there is no need to decide whether Chevron or a less exacting standard applies”).

. Mayo Found., 562 U.S. at 52, 131 S.Ct. 704 (quoting Chevron, 467 U.S. at 842, 104 S.Ct. 2778).

. E.g., lawful-permanent-resident ("LPR”) status, see 8 U.S.C. §§ 1101(a)(20), 1255; nonimmigrant status, see §§ 1101(a)(15), 1201(a)(1); refugee and asylum status, see §§ 1101(a)(42), 1157-59, 1231(b)(3); humanitarian parole, see § 1182(d)(5); temporary protected status, see § 1254a. Cf. §§ 1182(a) (inádmissible aliens), 1227(a)-(b) (deportable aliens).

. Arizona v. United States, 132 S.Ct. at 2499 (citing 8 U.S.C. §§ 1158 (asylum), 1229b (cancellation of removal), 1229c (voluntary departure)); see also § 1227(d) (administrative stays of removal for T- and U-visa applicants (victims of human trafficking, or of various serious crimes, who assist law enforcement)).

. Pub.L. No. 103-322, tit. IV, 108 Stat. 1902 (codified as amended in scattered sections of the U.S. Code). See 8 U.S.C. § 1154(a)(l)(D)(i)(II), (IV).

. USA PATRIOT Act of 2001, Pub.L. No. 107-56, § 423(b), 115 Stat. 272, 361.

. National Defense Authorization Act for Fiscal ■ Year 2004, Pub.L. No. 108-136, § 1703(c)-(d), 117 Stat. 1392, 1694-95; see also 8 U.S.C. § 1227(d)(2) (specifying that "[t]he denial of a request for an administrative stay of removal [for T- and U-visa applicants] shall not preclude the alien from applying for ... deferred action, or a continuance or abeyance of removal proceedings under any other provision of the immigration laws....").

. See 8 U.S.C. §§ 1151(b)(2)(A)(i), 1182(a)(9)(B)(i)(II), 1201(a), 1255; see Scialabba v. Cuellar de Osorio, - U.S. -, 134 S.Ct. 2191, 2199, 189 L.Ed.2d 98 (2014) (recognizing that legal immigration "takes time — and often a lot of it.... After a sponsoring petition is approved but before a visa application can be filed, a family-sponsored immigrant may stand in line for years — or even decades — -just waiting for an immigrant visa to become available.”).

. Although "[t]he Attorney General has sole discretion to waive [the ten-year reentry bar] in the case of an immigrant who is the spouse or son or daughter of a United States citizen or of an alien lawfully admitted for permanent residence, if it is established to the satisfaction of the Attorney General that the refusal of admission to such immigrant alien would result in extreme hardship to the citizen or lawfully resident spouse or parent of such alien,” § 1182(a)(9)(B)(v) (emphasis added), there is no such provision for waiving the reentry bar for parents of U.S. citizen or LPR children.

. DAPA Memo at 4.

. See 8 U.S.C. §§ 1151 (b)(2)(A)(i), 1152(a)(4), 1153(a).

. See, e.g., 8 U.S.C. §§ 1182(a)(9)(B)(v), (C)(iii) (authorizing waiver of reentiy bars for particular classes of inadmissible aliens), 1227(a)(l)(E)(iii) (authorizing waiver of inadmissibility for smuggling by particular classes of aliens).

. E.g., 8 U.S.C. §§ 1101(i)(2) (human-trafficking victims in lawful-temporary-resident status pursuant to a T-visa), 1105a(a) (nonim-migrant battered spouses), 1154(a)(l)(K) (grantees' of self-petitions under the Violence Against Women Act), 1158(c)(1)(B), (d)(2) (asylum applicants and grantees), 1160(a)(4) (certain agricultural workers in lawful-temporary-resident status), 1184(c)(2)(E), (e)(6) (spouses of L- and E-visa holders), (p)(3)(B) (certain victims of criminal activity in lawful-temporary-resident status pursuant to a U visa), 1254a(a)(l)(B) (temporary-protected status holders), 1255a(b)(3)(B) (temporary-resident status holders).

. E.g., 8 U.S.C. §§ 1226(a)(3) (limits on work authorizations for aliens with pending removal proceedings), 1231(a)(7) (limits on work authorizations for aliens ordered removed).

. Hoffman Plastic Compounds, Inc. v. NLRB, 535 U.S. 137, 147, 122 S.Ct. 1275, 152 L.Ed.2d 271 (2002) (alteration in original) (quoting INS v. Nat'l Ctr. for Immigrants’ Rights, Inc., 502 U.S. 183, 194 n. 8, 112 S.Ct. 551, 116 L.Ed.2d 546 (1991)).

. Id. (emphasis added) (citation omitted) (quoting 8 U.S.C. § 1324a(a)(l)).

.- Nat’l Ctr. for Immigrants’ Rights, 502 U.S. at 194, 112 S.Ct. 551 (quoting Powers and Duties of Service Officers; Availability of Service Records; Employment Authorization; Excludable or Deportable Aliens, 48 Fed.Reg. 51,142, 51,142 (Nov. 7, 1983)).

. Id. (quoting Sure-Tan, 467 U.S. at 893, 104 S.Ct. 2803); see 8 U.S.C § 1182(a)(5)(A)(i) (listing among the classes of excludable aliens those who "seek[] to enter the United States for the purpose of performing skilled or unskilled labor ..., unless the Secretary of Labor has determined and certified to the Secretary of State and the Attorney General that — (I) there are not sufficient workers who are able, willing, qualified (or equally qualified in the case of an alien described in clause (ii)) and available at the time of application for a visa and admission to the United States and at the place where the alien is to perform such skilled or unskilled labor, and (II) the employment of such alien will not adversely affect the wages and working conditions of workers in the United States similarly employed”).

. FDA v. Brown & Williamson Tobacco Corp., 529 U.S. 120, 133, 120 S.Ct. 1291, 146 L.Ed.2d 121 (2000).

. King v. Burwell, - U.S. -, 135 S.Ct. 2480, 2489, 192 L.Ed.2d 483 (2015) (quoting Util. Air Regulatory Grp. v. ERA,- U.S. -, *182 134 S.Ct. 2427, 2444, 189 L.Ed.2d 372 (2014)).

. "A canon of construction holding that to express or include one thing implies the exclusion of the other, or of the alternative.” Black’s Law Dictionary 701 (10th ed.2014).

. Tex. Office of Pub. Util. Counsel v. FCC, 183 F.3d 393, 443-44 (5th Cir.1999).

. Id. at 444 (concluding, on the basis of other statutory provisions, that "Congress intended to allow the FCC broad authority to implement this section”).

. See, e.g., Christensen v. Harris Cnty., 529 U.S. 576, 582-83, 120 S.Ct. 1655, 146 L.Ed.2d 621 (2000) (discussing expressio uni-us, and concluding that it does not inform the result, without suggesting that it has no applicability in administrative law); Rodriguez-Avalos v. Holder, 788 F.3d 444, 451 (5th Cir.2015) (per curiam) (relying on the expression of a term in one section of the statute to infer that its absence in another section suggests intent to foreclose its implication in the latter, even though the statute was subject to interpretation by the Board of Immigration Appeals).

.See Indep. Ins. Agents of Am., Inc. v. Hawke, 211 F.3d 638, 644 (D.C.Cir.2000) ("The Comptroller argues that the expressio unius maxim cannot preclude an otherwise reasonable agency interpretation. This is not entirely correct. True, we have rejected the canon in some administrative law cases, but only where the logic of the maxim ... simply did not hold up in the statutory context.... In this case, the two-canons upon which we rely [expressio unius and avoidance of surplusage] inarguably compel our holding that § 24 (Seventh) unambiguously does not authorize national banks to engage in the general sale of insurance as 'incidental' to 'the business of banking.' ”); see also Ronald M. Levin, The Anatomy of Chevron: Step Two Reconsidered, 72 Chi.-Kent L.Rev. 1253, 1280 (1997) (“[P]ost-Chevron cases have often set aside agency interpretations by drawing upon the full range of conventional statutory construction techniques at step one. Arguments from statutory structure and purpose ... are regularly examined at that step. So are canons of construction.”) (footnotes omitted).

. "As used in this section, the term ‘unauthorized alien' means, with respect to the employment of an alien at a particular time, that the alien is not at that time either (A) an alien lawfully admitted for permanent residence, or (B) authorized to be so employed by this chapter or by the Attorney General.”

. See Whitman v. Am. Trucking Ass’ns, 531 U.S. 457, 468, 121 S.Ct. 903, 149 L.Ed.2d 1 (2001) ("Congress, we have held, does not alter the fundamental details of a regulatory scheme in vague terms or ancillary provisions — it does not, one might say, hide elephants in mouseholes.”).

. "The Secretary ... shall be responsible for ... [establishing national immigration enforcement policies and priorities.”

. "[The Secretary] ... shall establish such regulations; prescribe such forms of bond, reports, entries, and other papers; issue such instructions; and perform such other acts as he deems necessary for carrying out his authority under the provisions of this chapter.”

. "The Attorney General shall establish such regulations, prescribe such forms of bond, reports, entries, and other papers, issue such instructions, review such administrative determinations in immigration proceedings, delegate such authority, and perform such other acts as the Attorney General determines to be necessary for carrying out this section.”

. Util. Air, 134 S.Ct. at 2444 (quoting Brown & Williamson, 529 U.S. at 159, 120 S.Ct. 1291); accord id. ("When an agency claims to discover in a long-extant statute an unheralded power to regulate 'a significant portion of the American economy,’ we typically greet its announcement with a measure of skepticism. We expect Congress to speak clearly if it wishes to assign to an agency decisions of vast 'economic and political significance.’ ” (citation omitted) (quoting Brown & Williamson, 529 U.S. at 159, 120 S.Ct. 1291)).

.The dissent urges the courts to give DHS leeway to craft rules regarding deferred action because of the scope of the problem of illegal immigration and the insufficiency of congressional funding. Dissent at 217. That is unpersuasive. "Regardless of how serious the problem an administrative agency seeks to address, ... it may not exercise its authority 'in a manner that is inconsistent with the administrative structure that Congress enacted into law.’ ” Brown & Williamson, 529 U.S. at 125, 120 S.Ct. 1291 (quoting ETSI Pipeline Project v. Missouri, 484 U.S. 495, 517, 108 S.Ct. 805, 98 L.Ed.2d 898 (1988)).
Because we conclude, at Chevron Step One, that Congress has directly addressed lawful presence and work authorizations through the INA's unambiguously specific and intricate provisions, we find no reason to allow DHS such leeway. There is no room among those specific and intricate provisions for the Secretary to "exercise discretion in selecting a different threshold” for class-wide grants of lawful presence and work authorization under DAPA. Util. Air, 134 S.Ct. at 2446 n. 8.
We merely apply the ordinary tools of statutory construction to conclude that Congress directly addressed, yet did not authorize, DAPA. See King, 135 S.Ct. at 2483 (noting that to determine whether Congress has expressed its intent, we "must read the words in their context and with a view to their place in the overall statutory scheme”); City of Arlington v. F.C.C., - U.S. -, 133 S.Ct. 1863, 1868, - L.Ed.2d - (2013) ("First, applying the ordinary tools of statutory construction, the court must determine whether Congress has directly spoken to the precise question at issue.”); Util. Air, 134 S.Ct. at 2441 (recognizing the "fundamental canon of statutory construction that the words of a statute must be read in their context and with a view to their place in the overall statutory scheme”). Now, even assuming the government had survived Chevron Step One, we would strike down DAPA as manifestly contrary to the INA under Step Two. See Chev *184 ron, 467 U.S. at 844, 104 S.Ct. 2778; Mayo Found., 562 U.S. at 53, 131 S.Ct. 704.

. Texas v. United States, 106 F.3d at 665 ("Courts must give special deference to congressional and executive branch policy choices pertaining to immigration.”).

. Medellin v. Texas, 552 U.S. 491, 532, 128 S.Ct. 1346, 170 L.Ed.2d 190 (2008) (quoting Dames & Moore v. Regan, 453 U.S. 654, 686, 101 S.Ct. 2972, 69 L.Ed.2d 918 (1981)). But see NLRB v. Noel Canning, - U.S. -, 134 S.Ct. 2550, 2560, 189 L.Ed.2d 538 (2014) ("[T]he longstanding 'practice of the government' can inform our determination of ‘what the law is.'" (citation omitted) (quoting McCulloch v. Maryland, 17 U.S. (4 Wheat.) 316, 401, 4 L.Ed. 579 (1819); Marbury v. Madison, 5 U.S. (1 Cranch) 137, 177, 2 L.Ed. 60 (1803))).

. Andorra Bruno et al„ Cong. Research Serv., Analysis of June 15, 2012 DHS Memorandum, Exercising Prosecutorial Discretion With Respect to Individuals Who Came to the United States as Children 9 (July 13, 2012); see Charlotte J. Moore, Cong. Research Serv., ED206779, Review of U.S. Refugee Resettle•ment Programs and Policies 9, 12-14 (1980).

. See Voluntary Departure for Out-of-Status Nonimmigrant H-l Nurses, 43 Fed.Reg. 2776, 2776'(Jan. 19, 1978) (deferring action on the removal of nonimmigrant nurses whose temporary licenses expired so that they could pass permanent licensure examinations); Memorandum from Michael Cronin, Acting Exec. Assoc. Comm'r, Office of Programs, INS, to Michael Pearson, Exec. Assoc. Comm’r, Office of Field Operations, INS 2 (Aug. 30, 2001) (directing that possible victims of the Victims of Trafficking and Violence Protection Act of 2000 ("VTVPA”), Pub.L. No. 106-386, 114 Stat. 1464, “should not be removed from the United States until they have had the opportunity to avail themselves of the ... VTVPA,” including receipt of a T- or U-visa); Memorandum from Paul Virtue, Acting Exec. Assoc. Comm’r, INS, to Reg'l Dirs., INS, et al. 3 (May 6, 1997) (utilizing deferred action for VAWA self-petitioners "pending the availability of a visa number”); Press Release, USCIS, USCIS Announces Interim Relief for Foreign Students Adversely Impacted by Hurricane Katrina 1 (Nov. 25, 2005) (deferring action on students "based upon the fact that the failure to maintain status is directly due to Hurricane Katrina”); see also United States ex rel. Parco v. Morris, 426 F.Supp. 976, 980 (E.D.Pa.1977) (discussing an INS policy that allowed aliens to "await the availability of a [Third Preference] visa while remaining in this country” under “extended voluntary departure”).

. DAPA Memo at 4 (limiting DAPA to persons who "have no lawful status”).

. Id. at 5 (specifying that DAPA "confers no ... immigration status or pathway to citizenship”). Throughout the dissent is the notion that DHS must pursue DAPA because Congress’s funding decisions have left the agency unable to deport as many illegal aliens as it would if funding were available. But the *185 adequacy or insufficiency of legislative appropriations is not relevant to whether DHS has statutory authority to implement DAPA. Neither our nor the dissent’s reasoning hinges on the budgetary feasibility of a more thorough enforcement of the immigration laws; instead, our conclusion turns on whether the INA gives DHS the power to create and implement a sweeping class-wide rule changing the immigration status of the affected aliens without full notice-and-comment rulemaking, especially where — as here — the directive is flatly contrary to the statutory text.
The dissent’s repeated references to DAPA as the appropriate continuation of a longstanding practice, see, e.g., Dissent at 189, badly mischaracterizes the nature of DAPA. Previous iterations of deferred action were limited in time and extent, affecting only a few thousand aliens for months or, at most, a few years. Memorandum on the Dep’t of Homeland Sec.’s Auth. to Prioritize Removal of Certain Aliens Unlawfully Present in the United States and to Defer Removal of Others, Dep't of Justice, Office of Legal Counsel, at *15-* 17 (Nov. 19, 2014).
Nothing like DAPA, which alters the status of more than four million aliens, has ever been contemplated absent direct statutory authorization. In its OLC memorandum, the Department of Justice noted that “extending deferred action to individuals who satisfied these and other specified criteria on a class-wide basis would raise distinct questions not implicated by ad hoc grants of deferred action.” Id. at *18 n. 8. Deferred action may be a decades-old tool, but it has never been used to affect so many aliens and to do so for so expansive a period of time.

. See Memorandum from Gene McNaiy, Comm'r, INS, to Reg'l Comm’rs, INS 1 (Feb. 2, 1990) (authorizing extended voluntary departure and work authorization for the spouses and children of aliens who had been granted legal status under the Immigration Reform and Control Act of 1986, Pub.L. No. 99-603, 100 Stat. 3359); see also Memorandum from Donald Neufeld, Acting Assoc. Dir., USCIS, to Field Leadership, USCIS 1 (Sept. 4, 2009) (authorizing deferred action for "the surviving spouse of a deceased U.S. citizen if the surviving spouse and the U.S. citizen were married less than 2 years at the time of the citizen's death” because "no avenue of immigration relief exist[ed]” and ”[t]his issue has caused a split among the circuit courts of appeal and is also the subject of proposed legislation in ... Congress”).

. "[A] bill that would have become the 'DREAM' Act never became law[; it] passed the House of Representatives during the 111th Congress and then stalled in the Senate.” Common Cause v. Biden, 748 F.3d 1280, 1281 (D.C.Cir.) (citing H.R. 5281, 111th Cong. (2010)), cert. denied, - U.S. -, 135 S.Ct. 451, 190 L.Ed.2d 330 (2014).

. Dist. Ct. Op., 86 F.Supp.3d at 657 & n. 71 (quoting Press Release, Remarks by the President on Immigration — Chicago, Ill., The White House Office of the Press Sec’y (Nov. 25, 2014)).

. Mayo Found., 562 U.S. at 53, 131 S.Ct. 704 (quoting Household Credit Servs., Inc. v. Pfennig, 541 U.S. 232, 242, 124 S.Ct. 1741, 158 L.Ed.2d 450 (2004)).

. We do not address whether single, ad hoc grants of deferred action made on a genuinely case-by-case basis are consistent with the INA; we conclude only that the INA does not grant the Secretary discretion to grant deferred action and lawful presence on a class-wide basis to 4.3 million otherwise removable aliens.

. Cf. Kos Pharm., Inc. v. Andrx Corp., 369 F.3d 700, 728 (3d Cir.2004) (“[W]hen the potential harm to each party is weighed, a party ‘can hardly claim to be harmed [where] it brought any and all difficulties occasioned by the issuance of an injunction upon itself.’ ” (second alteration in original) (quoting Opticians Ass’n of Am. v. Indep. Opticians of Am., 920 F.2d 187, 197 (3d Cir.1990))).

. Cf. Nken v. Holder, 556 U.S. 418, 435, 129 S.Ct. 1749, 173 L.Ed.2d 550 (2009) (“Once an - applicant satisfies the first two factors [for a stay of an alien's removal pending judicial review], the traditional stay inquiry calls for assessing the harm to the opposing party and weighing the public interest. These factors merge when the Government is the opposing party.”).

. See Wenner v. Tex. Lottery Comm’n, 123 F.3d 321, 326 (5th Cir.1997) ("It is well settled that the issuance of a prohibitory injunction freezes the status quo, and is intended 'to preserve the relative positions of the parties until a trial on the merits can be held.’ Preliminary injunctions commonly favor the status quo and seek to maintain things in their initial condition so far as possible until after a full hearing permits final relief to be fashioned.” (citation omitted) (quoting Univ. of Tex. v. Camenisch, 451 U.S. 390, 395, 101 S.Ct. 1830, 68 L.Ed.2d 175 (1981))).

. U.S. Const, art. I, § 8, cl. 4 (emphasis added).

. Immigration Reform and Control Act of 1986, Pub.L. No. 99-603, § 115(1), 100 Stat. 3359, 3384 (emphasis added).

. Arizona v. United States, 132 S.Ct. at 2502.

. Id. (quoting Wis. Dep’t of Indus., Labor. & Human Relations v. Gould Inc., 475 U.S. 282, 288-89, 106 S.Ct. 1057, 89 L.Ed.2d 223 (1986)).

. U.S. Const, art. Ill, § 1

. See, e.g., Earth Island Inst. v. Ruthenbeck, 490 F.3d 687, 699 (9th Cir.2006) (upholding a nationwide injunction after concluding it was "compelled by the text of [§ 706 of the] Administrative Procedure Act”), aff d in part & rev’d in part on other grounds by Summers v. Earth Island Inst., 555 U.S. 488, 129 S.Ct. 1142, 173 L.Ed.2d 1 (2009) (concluding that the plaintiff organizations lacked standing to challenge the forest service action in question); Chevron Chem. Co. v. Voluntary Purchasing Grps., 659 F.2d 695, 705-06 (5th Cir.1981) (instructing district court to issue broad, nationwide injunction); Brennan v. J.M. Fields, Inc., 488 F.2d 443, 449-50 (5th Cir.1973) (upholding nationwide injunction against a national chain); Hodgson v. First Fed. Sav. & Loan Ass’n, 455 F.2d 818, 826 (5th Cir.1972) (“[C]ourts should not be loath[ ] to issue injunctions of general applicability. ... 'The injunctive processes are a means of effecting general compliance with national policy as expressed by Congress, a public policy judges too must carry out— actuated by the spirit of the law and not begrudgingly as if it were a newly imposed fiat of a presidium.' ”) (quoting Mitchell v. Pidcock, 299 F.2d 281, 287 (5th Cir.1962)).